Marvin L. **FISHMAN and Illinois Basketball, Inc., Plaintiffs,**

v.

**ESTATE OF Arthur WIRTZ, William Wirtz; Lester Crown; Philip Klutznick; James Cook; Albert Adelman; Chicago Professional Sports Corporation; Emprise Corporation; Chicago Blackhawk Hockey Team, Inc.; and Atlanta Hockey, Inc., Defendants.**

**Nos. 74 C 2814, 78 C 3621.**

United States District Court, N.D. Illinois, E.D.

June 22, 1984.

Bruce S. Sperling, Paul E. Slater, Sperling, Slater & Spitz, P.C., Chicago, Ill., for plaintiffs.

Donald R. Harris, Jenner & Block, Chicago, Ill., for defendants.

## TABLE OF CONTENTS

### Findings of Fact

1. Background ........................................................ 857
2. Summary of the Parties' Respective Damage Theories ............. 858
3. Proper Approach to Measuring IBI's Compensatory Damages ...... 858
4. The 1982 Fair Market Value of the Chicago Bulls NBA Franchise . 861
   A. The 1982 Value of the Chicago Bulls Basketball Assets ....... 861
      1. Comparable Sales ...................................... 862
         a. Transactions Considered ........................... 862
         b. Computation of Sale Price ......................... 863
         c. Closeness of Comparability ........................ 865
            1. Size of City .................................... 865
            2. Population Growth ............................. 866
            3. Market Interest in Basketball .................... 866
            4. Existing Versus Expansion Franchise ............ 866
      2. Trend in Value ........................................ 867
      3. Profits and Losses of NBA Clubs, and Trends of Profits and Losses ................................................ 867
      4. Profits and Losses of the Bulls ........................ 869
      5. Testimony of NBA Franchise Owners .................... 869
      6. Tax Law .............................................. 870
      7. Pay TV ............................................... 870
      8. Arenas ............................................... 872
      9. Free Agent Rules ...................................... 872
      10. Other Assets of Comparables .......................... 873
   B. The Value of CPSC's Other Assets ......................... 873
   C. Value of Liabilities ...................................... 873
   D. Adjustments for IBI's Costs and Expenses in Owning and Operating the Franchise ......................................... 874
      1. Overview ............................................. 874
      2. Litigation Expenses and IBI Lower Purchase Price ........ 874
      3. Arena Expense ........................................ 874
      4. Differences in Executive Compensation ................... 875
      5. Interest Expense ...................................... 875
   E. Cost of Capital .......................................... 878
   F. Invested Capital ......................................... 879
   G. Summary of Yardstick Measure of Damages—The Value of the Chicago Bulls NBA Franchise ................................ 879
5. Disregard of IBI as Plaintiff ..................................... 880
6. Plaintiff Marvin Fishman's Damages ............................. 883
7. Equitable Relief ................................................ 885
8. The Settlement with the NBA Defendants ........................ 886
9. Punitive Damages ............................................... 886
10. Incorporation of Conclusions .................................... 887

### Conclusions of Law

1. The Legal Measure of Plaintiff's Damages ....................... 887
2. Opportunity Cost ............................................... 890
3. Equitable Relief ................................................ 891
4. Abatement of Punitive and Treble Damages Upon Death .......... 892
5. Summary ....................................................... 892

## MEMORANDUM OPINION
## AND ORDER

ROSZKOWSKI, District Judge.

Before the court is an action brought by plaintiffs to recover damages resulting from the acts of defendants which prevented Illinois Basketball, Inc. ("IBI") from purchasing the Chicago Bulls basketball franchise in 1972. After extensive discovery and disposition of numerous pretrial motions, this case was brought to trial February 28, 1979. This court ordered bifurcation of the trial, and after 8 weeks of testimony the liability portion of the trial was completed on April 20, 1979. The filing of post-trial briefs and proposed findings of fact and conclusions of law was completed by the parties on March 18, 1980. On October 28, 1981, this court entered judgment in favor of plaintiffs on Counts I, II, III, V, VI, VII, and VIII, and in favor of defendants on Count IV. The judgment for plaintiffs included judgments on six counts for violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and one count for violation of Illinois common law (tortious interference with business or economic advantage and tortious interference with contractual relations).

After extensive unsuccessful settlement negotiations, the damages portion of the trial was conducted February 22 through March 8, 1983. Post-trial briefs, proposed findings of fact and conclusions of law, various motions and other materials were submitted to this court, the last of which was received February 1, 1984. The following are the courts' findings of fact and conclusions of law on the remedies to which plaintiffs are entitled.

### FINDINGS OF FACT

### I.

### BACKGROUND

The Findings of Fact entered by this court on October 18, 1981 are incorporated by reference herein. Those findings included the following findings as to the injury to plaintiff IBI:

The acts of the defendants, in causing and participating in the refusal to deal, the Stadium boycott, the NBA conspiracy, and the interference with contractual relations and plaintiffs' prospective business advantage, directly caused injury to IBI's business and property by excluding IBI from the relevant market and destroying IBI's valuable property rights. Further, IBI was a foreseeable victim of the defendants' acts; and indeed, IBI was the target at which the defendants were aiming and was within the target area of defendants' acts.

More specifically, IBI suffered injury and damage in the following manner:

It was prevented from closing its contract to acquire the Chicago Bulls from the Rich group and thus prevented from realizing the benefits for which it had bargained. That contract was a valuable property right.

It was prevented from entering the business of presenting professional basketball exhibitions in the Chicago metropolitan area through ownership of the Chicago Bulls and, thus, prevented from enjoying all the anticipated economic benefits of doing so. (Opinion of October 28, 1981 at 52, 53).

The October 18, 1981 order also included the following finding concerning the injury to plaintiff Fishman:

The acts of the defendants also directly caused injury to Marvin Fishman, who was a foreseeable victim of defendants' conduct and was within the target area of the defendants' acts. More specifically, Marvin Fishman had a contract to be the chief executive officer of IBI for a minimum of three years, which contract provided that Fishman would receive a

substantial salary for his services. (Opinion of October 28, 1981 at 53).

## II.

## SUMMARY OF THE PARTIES' RESPECTIVE DAMAGE THEORIES

Plaintiffs contend that the damages for IBI's injury are to be measured by the "lost appreciation in value" of the Chicago Bulls franchise, measured as of May 31, 1982. Plaintiffs calculate these damages through the use of their "basic yardstick measure of damages." Essentially, the "yardstick" measures the difference between the appraised value of the assets of the Chicago Bulls as of May 31, 1982, and Chicago Professional Sports Corporation's ("CPSC") costs and expenses of purchasing and operating the Bulls since 1972, with certain adjustments to reflect IBI's hypothetical ownership of the Bulls. (Pl. Post-Trial Memorandum at 19; PX 647).[1] Plaintiffs also contend that IBI is entitled to the basketball assets of CPSC in exchange for $4.3 million, the sum of CPSC's purchase price for the stock of the Bulls and the liabilities that CPSC assumed in 1972. (Pl. Post-Trial Memorandum at 34, 55–56). Plaintiff Marvin Fishman seeks $318,000 in damages, representing the salary that he allegedly would have earned as chief executive officer of the Bulls between 1972 and 1982 had IBI acquired the franchise. Finally, plaintiffs week a trebling of those sums and an award of punitive damages, as well as costs and attorneys fees.

Defendants submit that plaintiffs' damages properly are measured by the lost benefit of plaintiffs' bargain as of 1972, i.e., the difference between the fair market value of the Chicago Bulls' stock in 1972, and the 1972 purchase price IBI had negotiated for the stock. They dispute the legal validity and applicability of plaintiffs' "lost appreciation in value" theory, but offered rebuttal evidence concerning the proper calculation of damages pursuant to that damage theory. Defendants also offered evidence relating to their contention that damages on plaintiffs' "lost appreciation in value" theory should be awarded solely to Fishman and not to IBI, and should be limited to 20% of any appreciation proved in order to prevent an unjust windfall to Fishman. In addition, defendants contend that Fishman lacks standing to maintain a claim for lost salary. In rebuttal, they contend that this claim for lost salary is overstated, but, in any event, is completely mitigated by his earnings since 1972. Finally, defendants assert that divestiture is not permissible in this case, and that an award of punitive damages is not appropriate.

## III.

## PROPER APPROACH TO MEASURING IBI'S COMPENSATORY DAMAGES

By their unlawful conduct, defendants precluded plaintiff IBI from acquiring the Chicago NBA franchise in the summer of 1972 and from enjoying the anticipated economic benefits of owning and operating that business. Rather, certain of the defendants have had the opportunity to enjoy and exploit the very same business over the past 10 years.

In the circumstances of this case, it is appropriate to use the actual financial experience of defendant CPSC as a 'yardstick" to measure the damage of plaintiff IBI. The measure of damages proposed by defendants would not fully compensate plaintiffs for their losses.[2] Because IBI's investment objectives were similar to CPSC's investment objectives,[3] and because

---

1. References to plaintiffs' trial exhibits will hereinafter be cited as "PX ____"; defendants' trial exhibits will be cited as "DX ____"; the trial transcript will be cited "L.Tr. ____" and "D.Tr. ____" for the liability and damage phases of the trial, respectively; and deposition transcript will be cited "[witness' last name] dep. [vol.] [page]."

2. *See* Conclusions of Law.

3. The principals of IBI testified to substantially the same investment objectives which motivated the principals of CPSC. Mr. Staley testified that his investment objectives included tax losses which would flow through a Subchapter S corporation and the opportunities of increasing value of the franchise leading to an eventual long term capital gain. (L.Tr. at 3084, 3121) Mr.

CPSC subsequently acquired and operated the very same business sought by IBI in the very same geographic market from 1972 to date, it is just and reasonable to use CPSC's actual experience in order to estimate IBI's damages.

In particular, in owning and operating the Chicago NBA franchise over the past 10 years, defendant CPSC has enjoyed substantial financial gain as discussed further below. Moreover, there is no indication that this gain was attributable to any special skill or resources contributed to the business by CPSC. Under the ownership of CPSC, the Chicago NBA franchise underperformed the average NBA franchise in playing performance, which, in consequence, substantially reduced gate receipts.[4] It won fewer games than average, seldom made the league "play-offs" in recent years, and generally did not appear to be a "contender" for divisional championships.[5]

Other defendants also received certain collateral benefits from CPSC's acquisition of the Chicago NBA franchise, including benefits from concessions contracts for home games, fees earned from making travel arrangements for the team, revenues from parking facilities near the Chicago Stadium, and revenues from renting office space to CPSC. Because plaintiffs have failed to show that they would have received any such collateral benefits had they obtained the team and have not listed a claim for such benefits in their damages

Block testified that his personal investment goals in IBI included tax benefits and an asset which would grow in value. In addition, he was motivated by a belief that pay TV would at some future date be instrumental in the growth of the sports franchise. (L.Tr. at 3591, 3670) Mr. Fishman also looked to pay TV generating benefits for the Bulls in the future and to the franchise increasing in value. (L.Tr. at 3561, 3846–7)

These investment objectives were long term in nature and thus it is reasonable to infer that IBI's ownership of the Bulls, like CPSC's, would have been long term. This inference is further supported by the fact that pay TV is just developing in Chicago (Sportsvision was created in 1981 (PX 526)), and a possible alternative playing site in the form of Rosemont Horizon opened in 1980. (Frank Fried dep. at 6–8)

4. In their pre-trial submissions (Pl. Pre-Trial Proposed Findings of Fact at 4, 7–10), and during opening statements (D.Tr. at 43–44), plaintiffs also claimed $2.60 million in "lost profits" for CPSC's alleged mismanagement of the Bulls from 1972 to 1982. Plaintiffs did not prove any specific acts of mismanagement by the defendants, nor that the alleged mismanagement had a quantifiable impact on CPSC's profit or loss. Plaintiffs dropped this claim in their post-trial brief. (Pl. Post-Trial Memorandum at 26) The court finds that plaintiffs are not entitled to damages for any profits lost as a result of mismanagement.

5.

Chicago Bulls Playing Performance

| | Win (W) – Loss (L) Record | Finish in Division | Overall NBA Finish |
|---|---|---|---|
| 1972–73* | W 51 – L 31 | 2nd out of 4 | 6th out of 17 |
| 1973–74* | W 54 – L 28 | 2nd out of 4 | 3rd out of 17 |
| 1974–75* | W 47 – L 35 | 1st out of 4 | 5th out of 18 |
| 1975–76 | W 25 – L 58 | 4th out of 4 | 18th out of 18 |
| 1976–77* | W 44 – L 38 | 3rd out of 6 | 9th out of 22 |
| 1977–78 | W 40 – L 42 | 3rd out of 6 | 14th out of 22 |
| 1978–79 | W 31 – L 51 | 5th out of 5 | 17th out of 22 |
| 1979–80 | W 30 – L 52 | 4th out of 5 | 18th out of 22 |
| 1980–81* | W 45 – L 37 | 2nd out of 6 | 8th out of 23 |
| 1981–82 | W 34 – L 48 | 5th out of 6 | 17th out of 23 |

* Participated in NBA playoffs.

Source: *The Sporting News NBA Guide.* (DX 496)

William Wirtz testified that in his opinion the Bulls' attendance would be better if they played better. (D.Tr. at 194) Arthur Wirtz recently recognized the effect of poor playing performance on attendance and gate receipts. In his memo to shareholders of 12/8/82, he stated, "Our attendance is down 23%, and this is probably due as a result of the team's standing ... but if our team improves as we are hopeful, it will be reflected in increased receipts." (PX 635)

computation (*see* Pl.Reply, Ex. A), however, these collateral benefits are not considered by the court in computing damages.

Certain individual defendants also have enjoyed substantial benefits from CPSC's acquisition of the Chicago Bulls. During the past 10 years, each of them have enjoyed the "ego" satisfaction (and publicity) inherent in the ownership of a major league sports franchise for the City of Chicago. This fact, in itself, has substantial financial value; indeed, it accounts, in part, for the premium prices such franchises command.[6] Also, the individual defendants have enjoyed their pro rata share of net tax "losses".[7]

The fact that the individual defendants have enjoyed ego and tax benefits during the period in which IBI should have owned

the club does not, however, affect the computation of damages in this case. The only plaintiffs in this action are IBI and Fishman. IBI, as a corporation, cannot enjoy "ego" satisfaction and, therefore, cannot have been damaged by having been deprived of the ego benefits of team ownership over the past 10 years. Nor can IBI have been deprived of tax shelter benefits. Fishman, the only individual plaintiff in this case, has not sought damages for deprivation of ego satisfaction or of tax shelter benefits; moreover, there was no proof that he could have utilized the large amount of tax benefits enjoyed by the individual shareholders of CPSC. Consequently, neither the deprivation of ego satisfaction nor the tax benefits experienced by CPSC shareholders are considered in computing plaintiffs' damages in this case.[8]

---

**6.** Various NBA owners or their counsel have testified as to the effect of the so-called "ego" factor on the value of NBA franchises:

William Putnam (Atlanta Hawks) testified that the ego factor was the greatest factor in the value of a franchise, and not financial considerations or tax benefits. (L.Tr. at 452)

Abe Pollin (Washington Bullets) testified that the ego factor is a factor in some men going into sports. (Pollin dep. at 69)

Luther Avery (counsel to Golden State Warriors), while not using the term "ego factor," nevertheless touched upon its existence when he testified that the value of sports franchises defy all conventional analysis and logic, particularly when they lose money. (L.Tr. at 918)

Mike Megna, plaintiffs' expert, also testified to the "ego factor" motivating people to purchase sports franchises. He described the sports field as a "unique industry" that attracts a "unique type of person" who seeks the image that results from ownership of a sports franchise. People who are successful in business but are otherwise unknown become "national heroes" when they become a sports franchise owner. This "pride of ownership" or psychological factor overshadows economic considerations of ownership. (D.Tr. at 231–4)

Paul Much, defendants' expert, also identified the ego factor in his testimony at trial. After concluding that the Bulls and the average NBA team are not economically viable, he stated, "So, really, what someone is paying for here from a qualitative standpoint is the emotional aspect of getting to the League." (D.Tr. at 666)

**7.** The prior owners of the Chicago Bulls and other NBA owners have testified to the signifi-

cance of tax (or paper) losses to the owners of sports franchises:

Elmer Rich testified that the Rich group generated tax losses which passed through to shareholders under CPBC, a Subchapter S corporation. (L.Tr. at 2949–50) (*See also* testimony of Sam Schulman, L.Tr. at 1644; testimony of William Putnam, L.Tr. at 503; testimony of Ira Levin, L.Tr. at 1829–30.)

The shareholders of CPSC have similarly benefitted from tax losses which flowed through CPSC, a Subchapter S corporation. The CPSC income tax returns through 1981 show gross tax losses of $5,198,919. When the taxable income in 1977 and 1978 is deducted from the gross amount of losses, the CPSC shareholders, on a net basis, have had the use of $4,374,355 in tax losses on their individual income tax returns.

Paul Much, one of defendants' experts, testified to the importance of tax benefits (losses) to owners of sports franchises. He stated that the tax benefits would serve to reduce out-of-pocket expenses of the investors. (D.Tr. at 747)

*See also* PX 730.

**8.** Nor could plaintiffs successfully argue that this court should ignore the corporate existence of IBI and treat it as a mere instrumentality of its shareholder on the grounds that Fishman is the real party in interest and damages should be measured by the injury Fishman experienced (which could include deprivation of ego satisfaction and tax benefits). The corporate entity will be disregarded and the corporate veil pierced only when to do otherwise would promote fraud or injustice. Treating plaintiff IBI as an entity separate from its shareholder would do neither. The court further notes that plaintiffs themselves have vigorously *opposed* defendants' argument that plaintiff Fishman should be

The financial benefits specifically realized by CPSC flowed (i) from the increasing going concern value of the business and (ii) from the cash generated from operation. These are the same sources that NBA owners generally attempt to exploit and are the sources IBI specifically intended to exploit.

The total financial gain of CPSC from August, 1972 to May 31, 1982 can be measured by determining the *net* value of CPSC's business as of May 31, 1982 (*i.e.* market value of assets less liabilities) and subtracting from that business value the net amount of all monies contributed to CPSC by its shareholders (*i.e.* all monies contributed less all monies distributed). The result measures the amount of CPSC's financial gain during the 10 year period.

## IV.

## THE 1982 FAIR MARKET VALUE OF THE CHICAGO BULLS NBA FRANCHISE

### A. THE 1982 VALUE OF THE CHICAGO BULLS BASKETBALL ASSETS

#### Introduction

Since damages are to be measured as of 1982, it is first necessary to determine the present value of the Chicago Bulls assets. This court heard the expert testimony and considered the report of Michael Megna, plaintiffs' appraiser, that the fair market value of the basketball assets of the Chicago Bulls was $15,000,000 in 1982. (PX 711) In rebuttal, defendants offered the expert testimony and report of Paul Much, that the value of these assets was $8,250,000 in 1982. (DX 423) In addition, the parties offered a substantial number of exhibits bearing on this issue. The chart below summarizes the respective positions of the parties as to the appropriate calculation of the value of the franchise in 1982.

treated as the real party in interest for purposes of determining whether plaintiffs had a responsibility to mitigate damages by investing in

| | Plaintiffs | Defendants* |
|---|---|---|
| Basketball assets | $15,000,000 | $8,250,000 |
| Other assets | | |
| current assets | 465,983 | 465,983 |
| receivable from NBA | 130,612 | 130,612 |
| notes receivable–players | 346,601 | 346,601 |
| investment securities | 224,406 | 224,406 |
| | $ 1,167,602 | $1,167,602 |
| | 16,167,602 | 9,417,602 |
| Liabilities | | |
| current liabilities | 1,825,650 | 1,825,650 |
| deferred compensation | 1,063,081 | 3,137,837 |
| settlement due NBA players association | 29,862 | 29,862 |
| | 2,918,593 | 4,993,349 |
| Net assets of CPSC | 13,249,009 | 4,424,253 |
| Less invested capital | 4,310,000 | 5,160,000 |
| | 8,939,009 | (735,747) |
| Add: | | |
| Fishman litigation expense | 1,190,281 | 1,190,281 |
| IBI lower purchase price | 50,000 | 50,000 |
| | 1,240,281 | 1,240,281 |
| Subtract: | | |
| Additional arena rent | disregarded | 1,182,000 |
| Opportunity cost on equity, at prime plus 3% | disregarded | 8,600,000 |
| Basic yardstick measure of damages | $10,179,290 | ($9,277,466) |

\* These calculations differ from defendants' damage calculations because they do not include any adjustment for IBI's increased interest rate and are based solely on CPSC's actual borrowings.

A number of factors are considered by this court in placing a value on the assets of the Chicago Bulls. First, and most important, is the value indicated by actual sales of NBA teams. To the extent that the clubs sold are comparable to the Bulls, these sales provide the best evidence of asset value. Other factors may also be probative of value. These factors include:

(1) the trend in value of NBA clubs as shown by past sales.

(2) profits and losses of NBA clubs, and the trend of profits and losses.

(3) profits and losses of the Bulls, and the trend of profits and losses.

(4) testimony of NBA owners and other experts.

(5) changes in tax laws making ownership more or less desirable.

(6) recent developments in pay TV.

(7) changes in availability of arenas.

(8) changes in free agent rules.

some other asset. Plaintiffs cannot urge that we maintain the corporate entity for one purpose and disregard it for another.

These factors are entitled to greater weight in determining value if the number of sales of NBA clubs is small and if the differences between the clubs are great (thereby diminishing the closeness of their comparability).

Because there were a number of sales of NBA clubs in recent years which were similar in many important respects to the Bulls, this court relied most heavily on the values indicated by these sales in determining value. Because the number of club sales was not large, because not all sales occurred immediately prior to the May 31, 1982 date upon which the court values the team, and because there were important differences between the Bulls and those clubs which are considered comparable, however, the other factors affecting value are considered.

The differences between the Bulls and the comparables are discussed under the heading "Comparable Sales." Each of the other factors is discussed below under a separate heading. The court is aware that these other factors may already have been taken into account by the buyers and sellers who entered into the comparable transactions, particularly in the most recent transactions.

### 1. Comparable Sales

#### a. Transactions Considered

There have been approximately sixty transactions since 1965 in which 10% or more of an NBA franchise has been sold. (DX 426) Not all of them, however, were appropriate for use as comparables in a quantitative analysis. Some involved sales of minority interests. Others involved a swap of debt of uncertain value for ownership of the franchise; thus, the price would not necessarily be indicative of the value of the franchise. (DX 423 at VI-6; D.Tr. at 642–43) The remaining transactions were not equally relevant comparables for valuation purposes. More recent transactions, for example, are more probative because they reflect changes in the economic attractiveness of NBA franchise ownership.

Defendants' expert, Mr. Much, testified that the following were the eight most comparable sales of NBA teams since 1978 for use as a starting point in determining the value of the Bulls: Houston (2 sales), Philadelphia, Milwaukee, San Diego, Indiana, New Jersey and Denver. He reached this result by excluding from the 60 transactions all those which involved sales of less than a controlling interest, a swap of debt of uncertain value for ownership of the franchise, sales of expansion franchises, sales of assets other than the basketball franchise, franchise exchanges, sales in which the franchise moved in the year of the transaction, and partial transactions in which it was uncertain whether there was a change in control.

Plaintiffs, on the other hand, maintain that sales of teams in major cities over the past five years comprise the pool of closest comparables. These franchises include Dallas (1980), New York Nets (now New Jersey Nets) (1978), Vancouver (1981), Philadelphia (1981), and Los Angeles (1979). Plaintiffs did not include either of the two Houston club sales, 1979 and 1982, even though Houston is larger than Dallas. Plaintiffs have also selected from a large pool of transactions involving teams in medium size cities a few sales which plaintiffs claim demonstrate the appropriateness of its $15 million asset valuation.

Although the court has reviewed the testimony, exhibits and post-trial submissions concerning the other transactions, the court considers the eight transactions listed by defendant and four of the five transactions listed by plaintiff to be the most comparable. The court excludes the Vancouver transaction on the grounds that there never was an actual sale of that club, but only an offer by an offeror who may not have had the financial wherewithal to make the purchase. Two transactions are considered by both parties in their comparative analyses; thus, the total number of close comparables is ten. It is these transactions upon which the court relies most heavily in making the determination of asset value.

### b. Computation of Sale Price

The parties differ widely in their approach to computation of sale price. Plaintiffs' approach is to add the cash, present value of notes taken by the seller and all liabilities assumed by the buyer to determine the value of the asset purchased. The liabilities assumed are listed in the respective asset or stock purchase agreements for each transaction and are quantified on the balance sheets of the franchise being sold.

Defendants agree that cash and present value of notes should be added to determine the purchase price, but they do not believe that all liabilities should be included in calculating the sale price of the basketball assets of a franchise. They argue that deferred compensation liability and other basketball liabilities assumed by the buyer should be excluded from the computation of sale price. Defendants argue that otherwise the value of a team can be increased simply by adding on liabilities.

Plaintiffs are correct in arguing that the value of the basketball assets of comparable teams should be computed by adding cash, the present value of notes and other liabilities including deferred compensation. The player contracts are a valuable asset as they provide the franchise with the right to receive player services for a period of time.[9]

The problem with plaintiffs' approach is not in their inclusion of deferred compensation in assessing the sale price of the assets *of the comparable teams.* Rather, it is in the assumption that those asset values can be used directly to compute the value of the assets *of the Bulls.* The Bulls have their own unique structure of player contracts. Those player contracts undoubtedly will be of shorter duration and for lower dollar amounts than those of some NBA teams and will be of longer duration and for higher dollar amounts than other teams. The player contract assets of the clubs, therefore, are not comparable.[10]

9. Player contracts are an asset in that they provide the franchise with the right to receive player services for a period of time. Player contracts are also a liability, as the franchise must pay the compensation stated in those contracts. For accounting purposes, the asset value of the player contracts may be recorded on the balance sheet in an amount equal to the deferred compensation entry on the liability side of the balance sheet.

Team ownership does not become more attractive the more player contracts a team has and the more it is obligated to pay for them. The accounting *worth* of a team is not enhanced by simply adding equal amounts of assets and liabilities to its balance sheet. Teams with longer term, higher dollar player contracts will have a higher value on their balance sheets for their basketball assets, but not a higher net worth.

A team can, of course, either increase or decrease its market worth by entering into player contracts. It increases its worth by making good deals, *i.e.,* negotiating contracts which set player compensation low enough relative to their incremental contribution to the teams revenue so that the contracts add to the team's profitability. Conversely, a franchise can decrease its market worth by making bad deals.

10. The following example illustrates how this incomparability can lead to incorrect estimates of value. Assume that Team A is comparable to Team B in all respects except that Team A has longer term player contracts (all 5 year contracts) than has Team B (all 1 year contracts).

Assume further that the players on Team A and Team B are identical in all respects and are paid identical annual salaries—$2 million annually for each term. The balance sheets of these teams are listed below:

| | Team A | Team B |
|---|---|---|
| **Assets** | | |
| Basketball assets | | |
| Franchise | 100,000 | 100,000 |
| Deferred Player Services | 10,000,000 | 2,000,000 |
| Other assets | 2,000,000 | 2,000,000 |
| **Liabilities** | | |
| Player Contracts | 10,000,000 | 2,000,000 |
| Other liabilities | 1,000,000 | 1,000,000 |
| Equity | 1,100,000 | 1,100,000 |

Now assume that Team A is sold for $2 million in cash, notes with a present value of $3 million and the buyer assumes the liability for the Team A player contracts, as well as $1 million in other liabilities.

Next assume the sale of Team A is used to estimate the market value of Team B—a team identical but for the length of its player contracts. Under plaintiffs' approach, we would add the cash, present value of notes, and liabilities assumed in the sale of Team A to estimate the value of the assets of Team B. The estimate under plaintiffs' approach would therefore be $2 million plus $3 million plus $10 million plus $1 million, or $16 million. To determine the net value of the Team B franchise, plaintiffs

The problem arising out of the incomparability of player contracts of otherwise reasonably comparable teams can be solved by simply eliminating deferred compensation entirely from all computations of the sale price of the comparables. In addition, the Bull's actual deferred compensation will not be deducted from our valuation of the Bull's assets to determine the Bull's net market value. The sale price for the assets of each NBA comparable, excluding deferred compensation, is computed below.

| (1) Team | (2) Year of Transaction | (3) Cash [11] | (4) Face Value [11] of Future Payments | (5) Present Value [12] of Future Payments | (6) Loan Liab. [11] Assumed (To Banks & Others) | (7) Deferred [11] Compensation | (8) Other [11] Assumed Liab. | (9) Other | (10) Sale Price Excluding Deferred Compensation (Sum of Columns 3, 5, 6, 8, 9) |
|---|---|---|---|---|---|---|---|---|---|
| New Jersey | 8/78 | $ 215,000 | $ 1,889,000 | $1,406,000 | 0 | $ 1,400,000 | $1,900,000 | $4,966,000 [13] | $ 8,487,000 |
| Philadelphia | 7/81 | $1,000,000 | 0 | 0 | 0 | $12,400,000 | $4,500,000 | $6,700,000 | $12,200,000 |
| Los Angeles [16] | 5/79 | – | – | – | – | – | – | – | $16,400,000 |
| Houston | 6/82 | $1,426,088 | $ 4,023,493 | $2,944,000 | 0 | $ 4,300,419 | $ 100,000 | 0 | $ 4,470,088 |
| Houston | 5/79 | $ 500,000 | $ 5,000,000 | $3,879,000 | 0 | $ 3,964,644 | $ 144,306 | 0 | $ 4,523,306 |
| Dallas | 5/80 | $2,000,000 | $10,000,000 | $8,700,000 [14] | – | – | – | – | $10,700,000 |
| Milwaukee | 11/79 | $3,761,000 [15] | – | – | – | – | – | – | – |
| San Diego | 6/81 | $4,600,000 | $ 1,050,000 | $ 699,000 | $ 700,000 | $ 4,898,175 | $ 671,077 | 0 | $ 6,670,077 |
| Indiana | 6/79 | $1,300,000 | $ 2,600,000 | $2,318,000 | 0 | $ 1,853,106 | $ 271,307 | 0 | $ 3,889,307 |
| Denver | 5/82 | $1,000,000 | $ 1,200,000 | $ 559,000 | $1,000,000 | $ 2,100,000 | 0 | 0 | $ 2,559,000 |

would then deduct the actual value of Team B's liabilities. The indicated net value, or market value, for Team B would be $16 million—$3 million = $13 million. According to plaintiffs, a buyer would pay $13 million in cash for the assets and liabilities (or stock) of Team B.

In fact, no buyer would be willing to purchase Team B for this sum. The reason is that the buyer of Team A, in assuming the large liability for deferred compensation, has acquired the right to receive the services of the Team A players for five years. He will incur no salary expenses for these players over the next five years beyond the $10 million of assumed liabilities. Consequently, for his $16 million investment, the buyer of Team A has obtained the franchise plus paid the salaries of his players for the first five years that he owns the team.

The buyer of Team B, in contrast, for his $16 million investment ($13 million in cash and $3 million in assumed liabilities), has obtained the franchise, but has only obtained the services of the Team B players for 1 year. Consequently, he will incur $8 million ($2 million × 4 years) more in salary expenses than the owner of Team A during the first five years of ownership. The Team B owner would therefore have invested $24 million to get his franchise and 5 years of player service, while the Team A owner paid $16 million for an identical franchise with 5 years of player service.

As in this example, under plaintiffs' method of calculating damages could lead to over-estimation or under-estimation of the value of the Bulls. If the Bulls have greater liability for player contracts than had the clubs sold in the comparable transactions, then plaintiffs' method will understate the value of the Bulls. If the reverse were true, plaintiffs' method would overstate the Bulls' value.

11. Figures from DX 425 unless otherwise indicated.

12. Figures from DX 423 at Section VI, unless otherwise indicated.

13. Includes $4 million payment to New York Knicks franchise for invasion of its territory (PX 486), and $966,000 (DX 425).

14. See PX Chart B.

15. Buyout of 19.4% of stock held by minority owners for $729,636. Although defendants would have the court take the $3,761,000 figure ((9,636) ÷ (.194)) to be the sale price of the assets, the figure really measures the sale price of the assets less liabilities. To determine the sale price of the assets only, the court would have to add the debt on the Milwaukee club's balance sheet to the $3,761,000. Because this figure has not been provided by the parties, the court is unable to do so, and columns 4–10 are therefore left blank.

16. In January, 1978, Mr. Megna, on behalf of American Appraisal, Inc., provided an appraisal of California Sports, Inc. ("CSI"). American Appraisal was retained by counsel representing Mrs. Cooke in divorce proceedings against Mr. Jack Kent Cooke to evaluate certain assets owned by Mr. Cooke. This appraisal expressed the "preliminary" opinion that the Los Angeles Lakers franchise was worth $13–16 million and the Los Angeles Kings franchise, the other major asset of CSI, was worth $5–6 million, for a total of $18–22 million. (D.Tr. at 217)

In May 1979, CSI, the Forum and the Ranch were sold by Mr. Cooke to Dr. Buss for a total of $52 million. The agreement setting forth the terms and conditions of the sale, states that the transaction will be consummated at three separate closings. The first of these closings was for transfer of the CSI stock for a sale price of $27,850,379. This sum was to be paid $10,000,-

### c. Closeness of Comparability

The indicated values of sales of comparable teams are not entitled to equal weight in determining the value of the Bulls. Several of the major factors affecting the closeness of comparability of these clubs to the Bulls are discussed below.

### 1. Size of City

Chicago is the third largest market in the United States. The "big city" teams such as New York, Chicago, Los Angeles, Houston and Philadelphia are generally more valuable than other NBA franchises for several reasons.

Major cities have greater potential for fan development because of the larger population. As Jack Kent Cooke (former owner of the Los Angeles Lakers) testified, it is not the number of fans that is important but population, because fans can be developed through promotion and advertising. For that reason, Chicago has a greater potential than Milwaukee. (Cooke dep. at 61–2) Since the NBA Constitution prohibits "gate sharing" for regular season games (PX 220), this gate potential inures to the benefit of the big city teams and enhances the value of those franchises.

The big city teams have a far greater potential for a television market. Abe Pollin testified that New York was more valuable than Washington for that reason. (Pollin dep. at 67) Several big city franchises have entered the pay TV market—Philadelphia/PRISM, (DX 561); Chicago/Sportsvision, (PX 526); New Jersey and Los Angeles, (PX 578).

The importance of size is dramatized by the amount of the territory invasion payment by the New York Nets. For the privilege of joining the NBA, the New York Nets were not only willing to pay the expansion price paid by other ABA teams joining the NBA in 1976 (Denver, Indiana and San Antonio); the Nets agreed to pay an additional $4 million to the New York

000 upon execution of the agreement, $6,636,903 in cash at closing, and $2,000,000 in the form of a note. In addition, Buss assumed $9,213,476 in liabilities. Buss acquired, along with the Lakers basketball assets and Kings hockey assets some $3,825,379 in nonfranchise (or "cash equivalent") assets.

Based upon these facts, Megna calculated the CSI sales price as follows:

| | |
|---|---|
| Cash and Note | $18,636,903 |
| Assumed liabilities | 9,213,476 |
| Total | $27,850,379 |
| Non-basketball assets | 3,825,379 |
| | $24,025,000 |

Megna stated that a good allocation of this would be $18 million for the Lakers and $6 million for the Kings.

Defendants criticize this estimate by stating that the appraisal was for the wife of the owner of the Lakers, who had an interest in setting a high value. Defendants also state that there is no basis for determining the exact portion of the sales price allocable to the Lakers. They point out that the buyer allocated $14 million for tax purposes to the value of the CSI stock. Based on Megna's $5–6 million valuation of the Kings in 1978, this would leave only $8–9 million as the value of the Lakers. Defendants conclude that these uncertainties "cloud [the transaction's] evidentiary value."

While the court agrees that uncertainty arising from the fact that several assets were purchased together does, to some extent, cloud the transaction's evidentiary value, the court does not think it eliminates the value completely. There is nothing in the record to suggest that the $18,636,903 sales price allocated by the parties to the agreement for the value of the CSI stock inaccurately reflects the true cash value (excluding assumed liabilities) of the stock perceived by the parties. A seller ordinarily would have no reason to want to overstate the value of the team because this could lead to a taxable gain. Absent proof to the contrary, there is no reason to suppose that the parties to the contract would either understate or overstate the value of the CSI stock.

The court credits Mr. Megna's testimony that of the $24 million price $18 million should be allocated to the Lakers and $6 million should be allocated to the Kings. Consistent with the court's approach throughout this opinion, $1.6 million in deferred compensation liability should be deducted to compute the value of the comparable. The result is $16.4 million.

Knicks for "invasion" of the Knicks territorial rights under the NBA Constitution. (Testimony of Allan Cohen, L.Tr. at 1689; PX 489)

Several NBA owners (or their counsel) testified that an ego factor attached to the ownership of a professional sports franchise and, consequently, increased the value. (Testimony of William Putnam, L.Tr. at 452; Pollin dep. at 69) Luther Avery testified that NBA franchises defy all conventional analysis as to valuation. (L.Tr. at 918) This psychological or non-financial factor is substantially greater for a big city franchise than for a smaller city. Thus, the larger the city, the larger the prestige of the franchise and the attendant publicity for its owners. In a large city, there are more local buyers who would value owning such a property.

William Wirtz testified that the Colorado Rockies NHL franchise paid $14.4 million to three other NHL franchises as an indemnity for the right to enter the New Jersey-New York market. This amount was in addition to the $8 million paid for the franchise itself. This further underscores the value of the major city markets. (D.Tr. at 143–7)

## 2. Population Growth

Population growth is another factor that could influence the degree to which the sales prices paid in other transactions are actually comparable to the sales price which would be paid for the Chicago Bulls. A rapidly growing population would lead a purchaser to expect that attendance will improve in the future. (DX 423 at VI–24) A reasonable purchaser would pay more for a franchise if the city were growing because he would expect a future increase in attendance. Consequently, cities such as Houston and Dallas, which are now smaller than Chicago but are growing more rapidly, may be more comparable to a Chicago franchise than a comparison between these cities' current populations would suggest.

## 3. Market Interest in Basketball

Each NBA market is also different. A particular market may command a higher price, even for an expansion franchise. For example, Irving Levin, former owner of the Boston Celtics and later owner of the San Diego Clippers, testified that the existing Chicago franchise was worth less than the New Orleans expansion franchise. (L.Tr. at 1803–04) Elmer Rich indicated that in 1972 CPBC would have sought more money for the Bulls franchise if Peter Graham intended to move it to San Diego because the team would have been worth more in a city other than Chicago. (PX 30)

Each city has its own history of support or non-support for professional basketball. (Pollin dep. at 72–73) This history would influence a reasonable purchaser because it provides some indication of the likely future financial performance of the club. (DX 423 at VI–3; D.Tr. at 642–43) A city's interest in basketball, however, is not easy to determine. It will undoubtedly be influenced by the basketball team's performance, by how colorful the team's players are, by how exciting the team's games are, and by how the team is advertised and promoted. The Bulls, for example, have achieved substantially higher attendance during times when they had winning seasons. The evidence presented at trial did not demonstrate that the level of interest in Chicago was either substantially higher or lower than in other cities. In view of this conclusion and in view of the difficulty of accurately gauging market interest in basketball, the court does not weigh this factor heavily.

## 4. Existing Versus Expansion Franchise

An existing franchise generally is more valuable than an expansion franchise. Other than the franchises (Denver, Indianapolis, New York Nets and San Antonio) from the American Basketball Association, NBA expansion teams are initially given player "castoffs" or less valuable players from

the entire NBA. (Testimony of William Wirtz, D.Tr. at 139–40; Pollin dep. at 68) For example, the Chicago Bulls are an established team with players viewed by other NBA owners as artistically competitive. (Testimony of William Putnam, L.Tr. at 500; Testimony of Ray Patterson, L.Tr. at 2229) (in 1982 the Bulls in talent were 50% better than the Rockets); Testimony of Ned Irish, L.Tr. at 1582; Testimony of Joseph Axelson, L.Tr. at 2316) The existing franchises thus have a higher caliber of players, a base of fans, a season ticket base and are generally located in larger metropolitan areas, with all the attendant benefits.

The fact that a team is an expansion franchise does not, however, always mean it is inferior to existing franchises. An expansion team might have bright prospects for other sources of revenue, such as local television contracts, or lower costs, such as a favorable arena lease, that would make the franchise less comparable to established teams. For example, in its first year, Dallas received more money in local television revenues than 15 of the other 22 established NBA teams, including Chicago, received in the same year. (DX 500 at Schedule 2) Dallas also had a favorable arena lease. (PX 707) The presence of these factors in the Dallas transaction suggest that the price paid for an expansion team can be affected by local factors that influence the likelihood of financial success.

Another owner, Sam Schulman of the Seattle Supersonics, testified that an expansion franchise might out-perform more established clubs. (L.Tr. at 1653) Indeed, several expansion teams, such as Seattle, Phoenix, Milwaukee and Portland, surpassed established teams in gate receipts in their early years despite mediocre records. (DX 304; DX 448; DX 385; DX 496; Pollin dep. at 72–73) Dallas also did well at the gate despite a poor playing record. (DX 382; DX 383; DX 496)

Because more recent sales, sales of teams in cities which are large or are becoming large, and sales of existing franchises are more similar to a sale of the Bulls than sales of franchises which lack these characteristics, the court attaches greater weight to transactions which have these characteristics. The transactions most comparable by these criteria are the most recent New Jersey, Philadelphia, Los Angeles, Houston and Dallas transactions.

In summary, the court regards the actual sales price of the basketball assets of other clubs to be the prime indicator of the value of the basketball assets of the Bulls. The other factors considered in valuing the Bulls are discussed below.

### 2. Trend in Value

NBA franchises have historically grown in value. (Trial testimony of Sam Schulman, L.Tr. at 1644) Defendants' expert, Paul Much, testified that the basketball assets of the Bulls franchise were worth $6.5 million in 1979 and $8.25 million in 1982. (D.Tr. at 838–39) The rate of growth in value has been moderate and appears to have slowed somewhat in recent years. The current growth rate is below 10% annually.

### 3. Profits and Losses of NBA Clubs, and the Trends of Profits and Losses

The league that eventually became the NBA was founded in 1946 with eleven franchises. (DX 496 at 219, 418) Chicago's entry (known as the Chicago Stags) folded after four years of operation. (DX 496 at 156) The second Chicago franchise (known as the Chicago Packers and later the Chicago Zephyrs) lasted only two years before it was moved to Baltimore in 1963. (DX 496 at 160) The Chicago Bulls franchise was created in 1966 when the NBA granted an expansion franchise to CPBC. (PX 201)

The NBA entered a period of growth beginning in 1966. The NBA expanded

from 9 teams to 17 teams between 1966 and 1970. (PX 201; PX 202; PX 203; PX 207; PX 208; DX 371; DX 425; DX 671) Interest in professional basketball was growing. A rival professional league, the American Basketball Association, was founded in 1968. (DX 496 at 137–39)

The more recent history of the league reflects operating losses for the average NBA team are up sharply.[17] In 1977–78, the average NBA team lost $91,000 on operations. (DX 423 at IV–9; DX 375) This figure does not include "paper" losses attributable to depreciation or the additional real losses caused by interest expenses. By 1980–81, the loss on operations climbed to $568,000 for the average NBA team (DX 423 at IV–9; DX 378), exclusive of an additional $339,000 in interest expenses. (DX 378 at 13) Losses on operations reached an all-time high for the period during the 1981–82 season, when the average NBA team's loss on operations increased to $686,000. (DX 423 at IV–10; DX 379; D.Tr. at 605) Interest expenses represented an added cash drain of $313,000 for the 1981–82 season. (DX 423 at IV–10; DX 379) Over the period from 1976–77 through 1981–82, the average NBA team lost $2,526,000 on operations. (DX 423 at IV–9; DX 374; DX 375; DX 376; DX 377; DX 378; DX 379) During 1980–81 and 1981–82, the only period for which interest expense information was available, interest expenses alone added another $652,000 in non-operating losses for the average team. (DX 379; DX 378)

Despite the addition of a new franchise (Dallas) in 1980, league attendance has declined over the last six years. (DX 423 at IV–3; DX 382; DX 383; DX 304) Broadcast ratings are also down from 1976 to 1981 for both regular season and playoff telecasts. (DX 423 at IV–5; D.Tr. at 631)

There has been growth in revenue during this period for the average NBA team. The rise in gate receipts, which comprise 61% of the revenue base for the average NBA team (DX 423 at IV–1), however, has been solely a function of rising ticket prices. (DX 423 at IV–4; D.Tr. at 631) The other source of increased franchise revenue has been television. The increased revenue from these sources, however, has not slowed the growth in operating losses. Indeed, at the same time that the total television revenue for NBA teams grew from $31.4 million to $38.3 million, the operating losses for NBA teams reached an all-time high of $15,770,000 for the 1981–82 season. (DX 378; DX 379)

Operating losses have continued to increase despite increases in revenues because costs have been rising even faster than revenues. (D.Tr. at 633–34) Foremost among the rising costs are players' salaries and benefits. (DX 423 at IV–6, IV–7, IV–8, IV–9) The average NBA team now spends over $3,047,000 per year (57% of its revenues) on player costs. (DX 423 at IV–9) Much of the rise in player costs can be attributed to free agency. (D.Tr. at 631–34; DX 423 at IV–6, IV–7, IV–8) (See infra, Free Agency section of this Opinion.)

The NBA recently formed a Subcommittee on Financial Stability to study the financial problems of the league and to develop procedures governing petitions by member clubs for reorganization or liquidation under the bankruptcy laws. (DX 423 at IV–11)

Despite the overall unfavorable operating results in recent years, there were a few bright spots. Interest costs have substantially receded, (DX 424; Testimony by Alan Peterson, D.Tr. at 1335); gate receipts for the NBA have continued to esca-

---

17. Detailed financial data, as compiled by Arthur Andersen & Co. for the NBA, is available for the 1976–77 season through the 1981–82 season. (DX 374; DX 375; DX 376; DX 377; DX 378; DX 379) Information is not available for the individual teams. (D.Tr. at 629) Rather, Arthur Andersen aggregates the information it receives from the teams and reports a league average.

late, (PX 643, 649); and spectators have evidenced a willingness to pay escalating ticket prices. From the 1979–80 playing season through the 1981–82 playing season, the NBA average ticket price has risen from $7.09 to $8.61. (PX 653, 654)

While these operating losses have an impact on team value, it must be remembered that these losses, and the even greater non-cash losses from depreciation, may provide substantial tax benefits to the franchise owners. The after tax results will, therefore, not be nearly so negative, and, indeed, may be positive. This explains, in part, why the clubs maintain high values in the face of substantial operating losses.

The NBA comparable transactions took place during the period in which these losses were incurred. This suggests that the buyers of NBA clubs have found value in the franchises despite the recent losses. Since the operating losses already are reflected largely in the purchase prices, the recent operating losses are considered a minor factor in determining value.[18]

### 4. Profits and Losses of the Bulls

The Chicago Bulls, like most NBA teams, have lost substantial sums of money on operations. The Bulls have had lower revenues than the average NBA team (DX 423 at V–2) despite having received gate receipts virtually identical to those received by the average NBA team since 1972. (DX 423 at V–3) The shortfall in revenue has been due, in part, to the absence of local pay television in the Chicago area. (DX 423 at V–4) At the same time, the Bulls' costs have been slightly lower than the average. (DX 423 at V–6, V–7, V–8) Accordingly, the Bulls have experienced operating losses that are consistent with the average NBA team over the last six seasons. (D.Tr. at 638–39; DX 423 at IV–9, V–9) The Bulls' costs will be reduced with their new lease at the Chicago Stadium for the 1982–83 season for a flat 15% rental

(D.Tr. at 200), a rate slightly lower than their prior overall rental rate of 19% (based on gate receipts of $3,000,000). (D.Tr. at 199). In the 1981–82 season, the Bulls' losses on operations exceeded $1,030,000. (DX 389)

The Bulls' losses have necessitated frequent calls to the owners of CPSC to provide further working capital. (D.Tr. at 1170) Over the last ten years, CPSC's shareholders have contributed $3,200,000 to maintain the team over and above their initial capital investment in 1972. (DX 423 at V–9; D.Tr. at 708–09) Although audited data is not yet available for the 1982–83 season, the Bulls' cash losses from operations between May 31, 1982 and December 31, 1982 alone were approximately $1,000,000 overall, or $850,000 excluding *Fishman* litigation expenses. (D.Tr. at 1148–49)

As the profit and loss history of the Bulls has not differed substantially from that experienced by average NBA clubs, this factor is given little weight in determining the value of the Bulls.

### 5. Testimony of NBA Franchise Owners

The testimony of NBA owners as to the value of their teams and the value of their teams in comparison to the value of the Chicago Bulls, provides additional evidence of value. William Putnam (Atlanta Hawks) testified that the Chicago Bulls were worth more than the Atlanta Hawks in 1972 and his group paid $5 million for the Hawks in 1972. (D.Tr. at 450–1) Since the NBA granted an expansion franchise to New Orleans in 1974 for $6 million, the Bulls would have been worth $8–9 million at the time. (D.Tr. at 452)

Sam Schulman (Seattle Supersonics) testified that as of the time of his deposition (April 27, 1977) the Seattle franchise was worth $10 million cash. (L.Tr. at 1638) He also testified that the Bulls would be worth as much as the Supersonics—$10 million. (L.Tr. at 1657) He turned down an offer

---

**18.** The one important change which has adversely affected profitability very recently is the new free agency rules. This new development in all likelihood has not been wholly anticipated and taken into account by the earlier comparable transactions. It is considered separately in section IV.A.9. of this opinion.

for the Supersonics in 1973 for $6½ million. (D.Tr. at 1648–51)

The deposition testimony of Sam Schulman and William Putnam on the value of the Bulls was given over five years ago and, therefore, does not take into account the changes in the economics of the NBA. Because the value of franchises has continued to increase since that time, however, their testimony is entitled to some weight in establishing a floor level for the value of the Bulls basketball assets.

### 6. Tax Law

Prior to 1976, purchasers of professional basketball teams had allocated up to 100% of the purchase price to player contracts, which could be amortized to provide tax deductions to offset income (DX 423 at II–2; D.Tr. at 376), with the remainder allocated to the franchise, a non-depreciable property. (D.Tr. at 602–03, 754–756) The Tax Reform Act of 1976, 26 U.S.C. § 1056(d), created a presumption that no more than 50% of the purchase price should be allocated to player costs, reducing the available tax deductions from franchise ownership.

Similarly, the Economic Recovery Act of 1981, 26 U.S.C. § 1, made the deductions for losses less valuable by reducing the maximum tax rate on ordinary income from 70% to 50%, thereby reducing the benefits of the deductions. (D.Tr. at 602–03; DX 423 at II–2) For example, after 1981, a $1,000,000 loss would make available to the owners of a franchise only $500,000 of tax relief instead of the $700,000 available under the prior law. (D.Tr. at 604)

Because most comparable transactions took place after the Tax Reform Act of 1976 was enacted, the effects of this Act largely have been taken into account by the parties to the transactions in fixing the franchise sale price. Consequently, this change in the tax law is entitled to little consideration in valuing the CPSC assets. The reduction in the maximum tax rate to 50%, however, occurred after a number of the comparable transactions and is considered by this court to be a factor reducing franchise value. The reduction in franchise value caused by the lower tax rate on ordinary income is offset, in part, by the lower tax rate on capital gains brought about by the Act. (Testimony of Paul Much, D.Tr. at 749–50)

### 7. Pay TV

The opportunity to exploit local pay TV is continuously developing in the Chicago area. One of the plaintiffs' experts, Michael Markovsky, testified that the Chicago area is just beginning to be wired for cable and that the pay TV potential in Chicago is growing. (D.Tr. at 495–9; PX 526, 625)

Edward Einhorn, one of the architects of the Sportsvision venture, also testified that the Chicago market is just beginning to be exploited. In fact, he is working on a pay TV venture that would join sports franchises in Detroit and Milwaukee with Chicago in a super-sports network. (D.Tr. at 155–6, 173; PX 679) Commercial TV has also advanced in the Chicago area since May, 1980. (PX 694; 528, 627)

The NBA has recently entered new contracts for pay TV that generate new income of $5.5 million per season for the NBA. (DX 524—Minutes of NBA Board of Governors of 1/30/82) In addition, the value of local broadcasting rights has increased for all NBA teams since 1979. (See PX 694, Ernst & Whinney report to NBA.)

The ownership of CPSC has shown substantial interest in exploiting the local media rights to the Chicago Bulls franchise. In essence, they have contributed those rights to a joint venture known as Sportsvision of Chicago, comprised of four Chicago professional sports franchises (Blackhawks, Bulls, Sting and White Sox). Together, they are exploring various ways of exploiting their rights in the electronic media business. The owners of the Bulls have a 22.5% interest. (D.Tr. at 183–84, 187; DX 522; DX 523)

Although the original projections for Sportsvision were optimistic, the results have not yet lived up to expectations. Original projections anticipated a total of 70,000 residential subscribers in December,

1982 and yearly increases in subscribers thereafter. At the end of December, 1982, however, Sportsvision had only 21,000 residential subscribers. (DX 532) Similarly, the original projections called for $40,000 of income to the Bulls' owners in December, 1982 and millions of dollars of income thereafter. (DX 532) The Bulls, however, received no income from the venture in 1982. (DX 547) In fact, Sportsvision lost $5.08 million by the end of December, 1982 and depleted its initial capital of $4 million. (D.Tr. 188–189; DX 547) The Bulls owners' share of these losses totalled $1,143,000. (DX 547 at 5) In January, 1983, Sportsvision borrowed an additional $6 million (DX 582–595), of which the Bulls' owners guaranteed $1,350,000. (DX 585)

It should be recognized that increases in local pay television revenue also have a cost: reduced attendance at home games and, therefore, reduced gate receipts. (DX 501 at 97–102; L.Tr. at 2456; Rothenberg dep. at 32–33) The decreases in gate receipts must be subtracted from the increased revenue.

The fact that Sportsvision has not become lucrative as quickly as the investors hoped does not, however, mean that the potential for enhanced pay TV revenue is not a factor increasing the value of the Bulls. Between November, 1981 and the present date, the Bulls' owners (through Circular TV Communications, the Bulls' partner in the Sportsvision venture) have invested directly or guaranteed loans of almost $2 million. (PX 606) Projections by Sportsvision have shown possible returns to the Bulls of as much as $6 million per year. These returns could still be realized. (PX 584) Arthur and William Wirtz have held their Blackhawk hockey team off commercial TV for several years to enhance their pay TV attractiveness. (Testimony of William Wirtz, D.Tr. 170–171) By also contributing the rights of the Blackhawks to Sportsvision and by investing an additional $2 million on behalf of that entity, the Wirtz's confirmed their belief in the future of the Sportsvision venture and the local TV market.

The potential for pay TV for the Chicago Bulls is further emphasized by the following testimony. William Wirtz testified that he never even responded to an offer by Mr. Dolan for significant cash payments for the pay TV rights for the Bulls and Blackhawks. (D.Tr. at 174–6; PX 675) The initial offer was for $2.85 million for 4½ years.

Based upon the evidence taken as a whole, the court concludes that the pay TV potential has substantially increased the value of the Bulls. The question now becomes whether the sales prices of the clubs sold in the comparable transactions, which provide the benchmark for the court's asset valuation, already reflect the enhancement to franchise value which pay TV has provided.

Several of the comparable transactions involve franchises which earned pay television revenue in the year of and prior to the franchise sale, or soon thereafter. In such cases, it is probable that the prospect of substantial local pay television revenues was a consideration implicitly incorporated in the transaction's purchase price. (D.Tr. at 596; DX 423 at VI–17) During the 1980–81 season, the Philadelphia 76ers earned $850,000 from the local cable broadcast of twenty-seven games, and had an escalating contract that yielded $980,000 more the next season and would yield a total of over $7,000,000 through 1985–86. (DX 500 at Schedules 5 and 6) The 1981 sale price of the Philadelphia 76ers undoubtedly reflected this fact. During their first two years in the league, the Dallas Mavericks received $350,000 under the first two years of an escalating three-year pay television contract. (DX 500 at Schedules 5 and 6) On the other hand, several of the most comparable transactions probably did not fully reflect the value which potential pay TV revenues have added to major city franchises in recent years. These include the 1978 New Jersey transaction and the 1979 Los Angeles transaction.

Based upon the evidence presented at trial, the court concludes that the extent to which the prospect of enhanced pay TV

revenues has boosted the value of big city franchises in recent years is not wholly reflected in the sales prices of the comparables. The prospect for substantial increases in this revenue in Chicago requires that this court make an upward adjustment of the value of the Bulls basketball assets from that indicated by the sales prices of the comparables.

## 8. Arenas

The Rosemont Horizon has now established itself as a suitable arena for basketball. DePaul University has played there 2 years and averaged 14,000 fans per game. It has a seating capacity of at least 17,500 and would be available at a rental rate of 10 to 12½% plus set-up costs. (Franklin Fried dep. at 8–9, 13–15)

The rent paid by CPSC for the Chicago Stadium exceeded the NBA average for the last five seasons. (PX 640–3, 649) They have made no serious attempt to renegotiate the lease in light of the availability of the Rosemont Horizon. When the existing lease of the Bulls expired, no effort was made to contact the Rosemont Horizon to explore renting that facility.

It should be recognized, however, that the comparable transactions already involved teams with more favorable leases than the Bulls' old or newly negotiated lease (D.Tr. at 200) at the Stadium. (PX 707) The prices paid for those franchises already implicitly included consideration of their lower lease rates. An addition to value because of the availability of lower lease expenses due to the Rosemont Horizon would, to some extent, double-count the impact of lower lease expenses on the value of the Bulls. Not all of these franchises, however, had two or more suitable playing arenas. Such available arenas would provide greater assurance of competitive rental rates in the future. Therefore, the availability of the Rosemont Horizon is a factor requiring an upward adjustment of the value of the Bulls from that indicated by the sales prices of the comparable transactions.

## 9. Free Agent Rules

As previously discussed under IV.A.2. of this Opinion, the operating losses experienced by the NBA have been caused by rapidly rising costs. (D.Tr. at 633–45) Of primary importance are rising costs of player salaries and benefits. The average NBA team now spends over 57% of its revenues on these costs. Much of the rise in player costs can be attributed to free agency.

Prior to the 1976–77 season, players were able to negotiate with only one NBA team for a salary. If the player demanded a higher salary and management refused, the player would be forced to choose between accepting the salary offered by management or not playing. (DX 423 at IV–7) Beginning with the 1976–77 season, a player whose contract expired was free to negotiate with any NBA team. If the free agent signed with a new team, the new team had to compensate the old team for the loss of the player with cash, draft choices or players. (DX 381 at 26–27) This system was referred to as free agency with compensation. (DX 423 at IV–7)

Beginning with the 1981–82 season, the new team is no longer required to compensate the team losing a player under free agency. (DX 381 at 28) The free agent's old team retains only a right of first refusal to match the offer of the competing club with the highest salary offer. (DX 423 at IV–7; DX 381 at 28–31) This unrestrained competition for player talent has produced increases in player costs. (DX 423 at IV–8; D.Tr. at 632–33) The largest increase came in 1981–82, the first year of "free agency without compensation." (*Id.*)

The changes in free agency rules for the 1976–77 season already have been taken into account, at least in part, in the prices of the comparable transactions. Some of the earlier comparable transactions, however, may not have taken free agency changes into account completely, as the rate of growth in player compensation almost certainly exceeded the expectations of many buyers. While the 1981–82 changes may not have been wholly unanticipated by

the buyers and sellers, the changes certainly will have some depressing effect on franchise value not reflected in most of the comparables transaction. The court, therefore, adjusts downward the value of the Bulls basketball assets from the amount indicated by the comparable transactions.

### 10. Other Assets of Comparables

Where a comparable transaction involves the sale of substantial non-basketball assets, the value of these non-basketball assets should be deducted from the sale price. The only such non-basketball asset mentioned by defendants in their post-trial submissions is that the Milwaukee franchise owns an interest in a pay TV venture. (PX 248 at Ex. A–21, A–27 to A–40) Little adjustment is required for this factor.

### Conclusion On Value Of Basketball Asset

The court finds that the actual sales prices of other professional basketball franchises provide the best evidence of the value of the basketball assets of these clubs. Consequently, the court gives great weight to these prices in fixing the value of the Bulls' basketball assets. The court further finds that more recent sales, sales of teams in cities which are large or are becoming large, and sales of existing franchises provide the strongest evidence of value of the basketball assets of the Chicago franchise. Based upon these criteria, the court finds that the most comparable transactions are the most recent New Jersey, Philadelphia, Los Angeles, Houston and Dallas transactions.

| Team | Year of Transaction | Sale Price Excluding Deferred Compensation |
|------|--------------------|--------------------------------------------|
| New Jersey | 8/78 | $ 8,487,000 |
| Philadelphia | 7/81 | $12,200,000 |
| Los Angeles | 5/79 | $16,400,000 |
| Houston | 6/82 | $ 4,470,088 |
| Dallas | 5/80 | $10,700,000 |

Because of the limited number of transactions, the less than perfect comparability of the above mentioned clubs to the Bulls, and the advent of developments subsequent to some of the comparable transactions, the court also finds that the sales prices of the comparable clubs should not be relied upon exclusively in determining team value. The court has therefore taken into account the factors discussed in Section IV.A.2–10 of this order. Most notably, this process has included upward adjustments due to developments in pay TV and differences in arena availability, and downward adjustments for recent changes in the tax law and in free agent rules.

After careful consideration of all the evidence, the court finds that, as of May 31, 1982, the value of the basketball assets of the Chicago Bulls franchise, exclusive of player contracts, is $11,500,000.

## B. THE VALUE OF CPSC'S OTHER ASSETS

As of May 31, 1982, the CPSC financial statements reflected the following assets in addition to basketball assets:

| | |
|------|------|
| Other assets | $465,983 |
| Current assets | 130,612 |
| Receivable from NBA | 346,601 |
| Notes receivable-players | 224,404 |
| Investment securities | 72,296 |
| | $1,239,896 |

Since the value of the equity in the NBA has already been reflected in the computation of the value of the basketball assets, defendants have argued that to count $72,296 in equity as an asset in addition to the basketball assets would be to double count this amount. Plaintiffs concede this much. (P.Reply at 33) The parties also agree on all other items listed as other assets above. This court agrees and finds that the value of CPSC's non-basketball assets as of May 31, 1982 was $1,167,602.

## C. VALUE OF LIABILITIES

The parties agree on all values of CPSC liabilities except for deferred compensation. Plaintiffs, through the expert testimony of Mr. Zeyn, would have the court deduct the present value of these liabilities (even though plaintiffs used gross deferred compensation figures to calculate the value of the assets of the comparables). Defendants argue that a gross figure for deferred compensation should be deducted from the value of the Bulls' assets to determine the Bulls' worth (even though defendants argue that deferred compensation should be

excluded entirely from the computation of the value of the basketball assets of the comparables).

For the reasons set forth in section IV.A.1.b. of these Findings of Fact, this court has entirely excluded consideration of deferred compensation from computation of damages—both in fixing the value of the assets of the comparables and in determining the liabilities which should be deducted from the value of the CPSC assets to determine CPSC's worth. Consequently, the court finds the value of CPSC's liabilities which will be deducted from CPSC's assets to be as follows:

| | |
|---|---|
| Current Liabilities | $1,825,650 |
| Settlement due NBA players association | 29,862 |
| Total Liabilities | $1,855,512 |

## D. ADJUSTMENTS FOR IBI'S COSTS AND EXPENSES IN OWNING AND OPERATING THE FRANCHISE

### 1. Overview

A determination of the Chicago Bulls' 1982 asset value and liabilities is only the first step in calculating "lost appreciation in value." The second step in the calculation is to identify probable differences between CPSC's actual costs and the cost IBI likely would have incurred had it purchased and operated the franchise. Then, the court must calculate what IBI's net liabilities would have been as a result of those differences in expenses. By thus adjusting CPSC's performance to reflect IBI's hypothetical ownership, a "lost appreciation in value" damage calculation will compensate plaintiffs for the financial benefit plaintiffs would have received had they obtained the team in 1972.

### 2. Litigation Expense and IBI Lower Purchase Price

Plaintiffs distinguish between CPSC's and IBI's ownership by adding a credit to the "estimated gain by CPSC" in their "yardstick" calculation in an amount equal to the two expenses incurred by CPSC which would not have been incurred by IBI, *i.e.*, the $1,190,281 of CPSC's *Fishman*

litigation expenses and the $50,000 difference between CPSC's and IBI's franchise purchase price. (PX 647) Defendants do not dispute these corrections, and the court finds them to be appropriate.

### 3. Arena Expense

In the spring and early summer of 1972, Elmer Rich, the president of CPBC, negotiated for a lease at the Chicago Stadium on behalf of IBI. (L.Tr. at 3508–09, 3594–97, 4159–60, 4162; Fishman dep. v. 8 at 21, 17–18; Blumenthal dep. v.3 at 399, 401) At Marvin Fishman's instruction, Rich sought a lease with terms identical to the then current Bulls lease ("the Rich lease"). (DX 4; Fishman dep. v. 8 at 21–22; 26–27; Blumenthal dep. v. 3 at 401) Fishman never asked Rich to negotiate any reduction in the Rich lease rent terms. (Fishman dep. v. 8 at 27) He was satisfied with the terms of the Rich lease (Fishman dep. v. 8 at 27), and was willing to take a ten year lease on the rental terms in the lease. (L.Tr. at 4297–98, 4168–69, 4186–87, 3508–09) He believed that IBI could operate on the Rich lease terms and still make a profit. (L.Tr. at 4007–08, 4069, 4173) Under the Rich lease terms, CPSC paid 15% of the first $600,000 in net receipts, two graduated payments on net receipts between $600,000 and $800,000, and 25% of all net receipts over $800,000. (DX 4) Thus, IBI would have been paid rent at the rate of 25% on net receipts between $1,250,000 and $1,750,000.

Prior to either IBI's or CPSC's submission of a firm purchase offer, the Crown group decided to contact Arthur Wirtz and attempt again to negotiate a lease for the Chicago Stadium. (L.Tr. at 4742, 4872–73) At the group's direction, Lester Crown proposed a ten-year lease with a waiver of rent on gate receipts between $1.25 and $1.75 million. (L.Tr. at 1071, 4742–44, 4884–86, 5005–10; DX 185) As part of the proposal, the group suggested Wirtz take an equity position in the team. (L.Tr. at 601–03, 934–36, 1931, 1190, 4744) Ultimately, Wirtz took a 16.9% equity position in the team (L.Tr. at 4745, 1943), and, thereafter, Wirtz and CPSC entered into a ten year lease,

which provided for a ten year waiver of all rent on receipts between $1,250,000 and $1,750,000. (PX 185)

Although Fishman was willing to accept a ten year lease on the rental terms of the Rich lease, there is nothing in the record which demonstrates that the term of a Fishman lease of the Stadium would have been ten years. Had a lease of that length been entered into, IBI would indeed have incurred additional expenses as defendants argued. Had a lease shorter than ten years been agreed to, however, it is quite possible that IBI would have experienced lower lease expenses than did CPSC. By 1980, the Rosemont Horizon was available and IBI could have insisted on a lower (i.e., competitive) rental at the Chicago Stadium. The rental savings to IBI for the ensuing two seasons alone could have been between $370,000 and $500,000.[19]

Given this uncertainty regarding whether IBI would have experienced greater or lesser lease expense, the court finds that it is best not to adjust the yardstick for this factor.

### 4. Differences in Executive Compensation

Defendants state in their post-trial proposed findings that IBI would not have incurred CPSC's executive salary expenses or consulting expense and that IBI would have incurred an annual executive salary expense of $60,000. Defendants do not, however, develop this point in their post-trial briefs and they do not include it in their computation of the value of the Bulls in Appendices A and B to the post-trial briefs. Similarly, plaintiffs do not include it in their computation of damages in the appendix to their post-trial reply brief. Thus, the court makes no adjustment to the yardstick for these factors.

### 5. Interest Expense

Defendants argue that the liabilities of the Bulls franchise would have been much higher under IBI ownership than under CPSC ownership because IBI would have incurred additional interest expense on borrowings to fund the purchase and operations of the team. CPSC funded the purchase and immediate working capital needs of the Bulls franchise with $2.3 million in equity and $1.4 million in debt, at an interest rate of prime plus one-half percent. Defendants point out that there is evidence indicating that IBI, or its shareholders, would have borrowed from $2.1 million to $5 million at 3% over prime from Continental Illinois National Bank to finance the purchase and operation of the franchise.

The Continental Bank set an interest rate at 3% over prime, floating, for borrowings relating to IBI's purchase of the team. (PX 40 at 3–4; D.Tr. at 475; L.Tr. at 2129; Chernof dep. v. 3 at 27; Blumenthal dep. v.2 at 204; Plaintiffs' Answers to First Set of Interrogatories (6/11/75), Answer 10(d) at 11; DX 177; DX 172) Subsequently, Continental Bank loaned $330,000 for a down payment on IBI's franchise purchase price at an interest rate of 8¾% which was nearly identical to a rate of prime plus 3%.

19. Rosemont Horizon was available in May 1980 and would have leased to the Bulls at the rate of 10–12 ½% depending on the terms of the lease. (Frank Fried dep. at 6, 15–16) Thus, during the 1980–82 seasons, the rent savings for the regular season to the Bulls by playing at the Horizon would have been as follows:

|  | Net Receipts | Paid to Stadium | 10% Lease | 12½% Lease |
|---|---|---|---|---|
| 1980–81 | $2,478,687 | $461,260 | $247,868 | $309,835 |
| 1981–82 | 3,029,602 | 600,090 | 302,960 | 378,700 |

Sources: PX 542, 648

| Difference between amount paid by CPSC and 10% Lease | Difference between amount paid by CPSC and 12½% Lease |
|---|---|
| 213,392 | 151,425 |
| 297,130 | 221,390 |
| $510,522 | $372,815 |

(Plaintiffs' Answers to First to First Set of Interrogatories (6/11/75), Answer 10(h) at 12; DX 633; PX 40 at 3–4)

CPSC financed a portion of its purchase of the Chicago Bulls franchise with a loan from Continental Bank bearing an interest rate at one half percent above prime, floating. (PX 116 at 1; L.Tr. at 2129–30) The different interest rates reflected the Continental Bank's perception of the credit worthiness of the two different groups. As Michael Feltes, a Continental Bank officer testified, "[h]igher rates reflect greater risks." (L.Tr. at 2130–2131)

Fishman testified that Continental Bank made a $5 million loan commitment to IBI to fund the purchase of the basketball franchise (Fishman dep. v. 2 at 196–197, 194, 191–192, 233–234, 236–238; Plaintiffs' Answers to First Set of Interrogatories (6/11/75), Answer 10(d) at 11; *accord* L. Levin dep. v. 2 at 22, 23–24), to be secured by the guarantees of five IBI shareholders. (Fishman dep. v. 2 at 191, 196–197) Robert Block, IBI's president, also testified that Continental Bank had agreed to fund the purchase of the franchise. (L.Tr. at 3678) Fishman also testified that all the shareholders would have guaranteed the loan, and that this was a "100 percent loan for the purchase," with $3.25 million to be paid at the time the franchise sale closed and $1.75 million to be "drawn down" as necessary for operating expenses. (Fishman dep. v. 2 at 236–237, 233–234) Consistent with this testimony, Fishman testified that no individual was going to put any cash into the purchase. (Fishman dep. v. 2 at 234) A Continental Bank officer also testified that the loan commitment was made to the corporation, upon the guarantees of four individuals, and that the Bank was looking to the team for repayment. (L.Tr. at 2127–28)

Other Continental Bank documents, however, indicate that at one point the bank intended to lend $4 million (PX 40 at 3), and that at another time the bank had indicated a willingness to lend a minimum of $2.1 million or an amount equal to the required share of the purchase price for six share-

holders. (PX 40 at 4) In June, 1972, Continental Bank loaned $330,000 for the down payment on the IBI franchise purchase price. (PX 40 at 3; Fishman dep. v. 2 at 196–197)

Plaintiffs dispute defendants' contention that IBI would have incurred greater interest expense due to higher borrowings at higher interest rates. First, plaintiffs claim that, if anything, IBI would have borrowed less than did CPSC. In this regard, CPSC borrowed $1.4 million from the bank to use toward the purchase price of the Bulls and paid interest on that amount for years. The shareholders of IBI, in contrast, were obligated by their subscription agreements to personally provide up to $4.5 million of capital to IBI, which was more than enough to fund the acquisition (and all future cash needs, if any). Plaintiffs further state that the IBI shareholders were obtaining the monies to fund their respective contributions from various sources and they did not intend to cause or permit IBI to borrow the acquisition funds. Finally, plaintiffs state that it would have made no sense for IBI to borrow the acquisition funds as defendants suggest. IBI's shareholders intended (as did CPSC's shareholders) to exploit the significant tax benefits inherent in this investment. To do so, they had to invest personally at least as much as the anticipated "tax losses." Otherwise, they would not have had sufficient "basis" in their stock to utilize the "losses." Consequently, the only possible inference is that IBI's shareholders would have personally invested at least as much as CPSC's to insure utilization of the available tax benefits.

Plaintiffs also argue that regardless of how the transaction was initially capitalized, IBI would not have kept the loans outstanding indefinitely. IBI's initial line of credit was arranged when "prime" was 5%. Thus, in its effort to arrange and close the transaction, IBI was not concerned with negotiating the best possible lending rate for its working capital needs; it was concerned with making certain it had funds to close the deal and start opera-

tions. Assuming it was willing to accept a working capital loan at what was then 8%, this hardly demonstrates that it was willing to borrow at "prime plus 3" continually through the next 10 years when the "prime" rose to unprecedented heights.

Plaintiffs also contend that the evidence does not show that IBI necessarily would have paid a higher interest rate than CPSC from 1972 to 1982 for working capital. In this regard, plaintiffs point to the initial discussions between IBI and the Continental Bank in 1972 with reference to a working capital line of credit. They contend that the "tentative rate structure" considered by Continental for IBI, as a start-up venture, provides an unsatisfactory basis to project IBI's operating experience as a going concern over the next 10 years. Instead, plaintiffs argue that CPSC's experience should be looked to as a "yardstick." Otherwise, plaintiffs argue, IBI's initial performance projections would be pertinent and IBI would be claiming annual gate receipts at the top of the NBA. Plaintiffs conclude that because of the preliminary nature of this information, CPSC's actual experience over the 10 year period provides a more just and reasonable estimate of what IBI's experience would have been.

Since the evidence showed that Continental Bank ultimately was willing to loan working capital to the same business when owned by CPSC at "prime plus ½," plaintiffs contend that it is reasonable to infer that, once IBI established itself, it would have obtained the same rate for the same loan to the same business. In support of this contention, plaintiffs point out the continual escalation of the value of the Bulls and other NBA franchises over the last ten years.

Consequently, plaintiffs conclude the evidence does not show that IBI would have incurred higher interest expenses than CPSC. It may well have borrowed substantially *less* money at the outset (*i.e.*, less than $1.4 million). In addition, the evidence, plaintiffs say, did not show that its "rate" on working capital over the next 10 years would have been higher. As a re-

sult, plaintiffs state that IBI's damages should not be reduced by reason of any additional interest expense.

In considering all the evidence, there remains doubt concerning the amount which IBI would have borrowed to acquire the Bulls franchise and for initial working capital. The negotiations with Continental Bank were tentative. Even if large lending commitments had been obtained from Continental, IBI probably would not have been required to borrow the entire amount committed had IBI shareholders decided to contribute more capital at any time. Under these circumstances, it is reasonable to use the amounts actually borrowed by CPSC for the acquisition and initial capitalization of the franchise as the best estimate for what IBI would have borrowed. The court finds that IBI would have borrowed this amount and made principal payments on the loan in the amounts and at the times made by CPSC.

As to the amount which IBI would have borrowed over time to fund operating losses, there is also, of course, uncertainty. Defendants chose to fund operating losses substantially through use of equity. Had IBI obtained the team, IBI shareholders probably would have received tax benefits from team ownership which would have assisted them in making capital contributions to IBI so that IBI could use equity to cover operating losses. Particularly in the early 1980's when interest rates were very high, it seems likely that IBI would have chosen to fund operating losses through equity rather than debt. Under these circumstances, the court finds that IBI would have utilized the same pattern of using equity to fund operating losses that CPSC used.

Although the evidence is conflicting on the interest rate which would have been paid by IBI, the court gives great weight to the substantial and rapid appreciation in value of the franchise. In addition, plaintiffs would have been operating the very same going concern that defendants operated. These are the factors which, over virtually the entire 10 year period, would

have been most important to a lending institution considering an extension of credit to IBI. Consequently, the evidence supports plaintiffs' position that IBI would have paid interest at a rate equal to that which defendants paid.

### E.  COST OF CAPITAL

In addition to the difference in interest expense, defendants also claim that it is necessary to include a deduction in the damages computation for the cost of capital associated with equity contributions, *i.e.*, "opportunity cost" or "imputed interest." This opportunity cost would apply to the portion of the $3.65 million purchase price and initial working capital needs of the Bulls which IBI would fund by equity instead of debt. The cost of IBI's equity is calculated by compounding the amount of equity invested annually by IBI or its shareholders times the period of time the equity is invested times the opportunity cost rate. (D.Tr. at 1246–48) The amount of equity invested annually in IBI was shown in alternative assumptions in defendants' damage calculation. (DX 424 at 1, 13, and 19)

Defendants state that the opportunity cost rate is determined with reference to the interest rate at which related major borrowings were to be made. (D.Tr. at 1225–27, 1228–30) IBI's $330,000 purchase price down payment was borrowed at an interest rate of about 3% over prime, and at least 40% of IBI's shareholders intended to borrow money at an interest rate of 3% over prime. Accordingly, defendants conclude that IBI's opportunity cost rate is also 3% over prime. (D.Tr. at 1225–27) They argue that this opportunity cost rate incorporates expectations concerning the investment decision, the risk of the investment as perceived by Continental Bank, and the common corporate borrowing rate over the ten year period involved. (D.Tr. at 1212–1227) Three percent above prime averaged 13.4% for the period 1972 through 1982. (D.Tr. at 1248)

Defendants conclude that because plaintiffs' "yardstick measure of damages" does not reflect any opportunity cost, or imputed interest, for the equity capital that would have been invested by IBI (D.Tr. at 1210–11), the "yardstick measure of damages" overstates plaintiffs' damages by the amount of the opportunity cost. (D.Tr. at 1211–12)

Plaintiffs object to any deduction of opportunity cost in the damages computation for several reasons. First, plaintiffs object to the opportunity cost argument because it assumes that, since IBI did not purchase the Bulls, it had the "opportunity" to invest its monies in another venture. IBI, however, had no other reasonably similar opportunity available to it. It was formed for the sole purpose of acquiring the Chicago Bulls. Absent that acquisition, it had no obligation, ability, or right to obtain any funds from its shareholders for other investments.

Further, plaintiffs argue that, to the extent defendants used the term "opportunity cost" to identify the "cost of capital," the opportunity cost was a cost of IBI's shareholders, not IBI. Plaintiffs assert that the shareholders' personal experience is too remote from this litigation to be relevant to the damage calculation. For example, some of IBI's shareholders may have taken the resources they would have invested in IBI and lost them in another investment. They cannot recover for such additional loss.

Plaintiffs also state that defendants' "cost of capital" argument ignores reality. Plaintiffs assert that one of the shareholders' basic investment considerations and objectives was to utilize the available tax shelter so as to minimize the actual out-of-pocket costs of their investment. These benefits were relied upon in making the investment decision by both IBI's and CPSC's shareholders. Moreover, these benefits were in fact received by CPSC's shareholders and, as anticipated, served to reduce substantially the actual cost of this investment. Plaintiffs state that through December, 1975, these tax benefits had returned to CPSC's shareholders up to 70% of their equity investment.

The court finds that IBI's opportunity cost should be deducted to arrive at the fair and accurate measure of IBI's damages. Had IBI acquired the Bulls, it would have incurred operating losses which it would have funded through equity obtained from its shareholders. Because IBI was prevented from acquiring the Bulls, it did not have to fund these losses with equity contributions. IBI, therefore, would have had the use of the funds contributed by the shareholders. If the court did not deduct for opportunity cost, IBI's damages would be inflated by the court's prior conclusion that IBI would have funded operating losses through equity rather than debt, even though IBI had realized the benefits of use of that same equity for other purposes. This would put IBI in a better position than it would have been in had it acquired the team.

As to the appropriate rate for opportunity cost, the court finds that interest rate on 90 day U.S. Treasury Bills is appropriate. This is the rate that IBI could have earned on the equity it would have obtained from its shareholders. Assigning for the opportunity cost rate that interest rate which corresponds to the most nearly riskless security on the market is consistent with the principle that a plaintiff is not required to mitigate damages by making a risky investment or by investing in a different business. Consequently, the court concludes that the 90 day T-bill rate is the appropriate opportunity cost rate.

### F. INVESTED CAPITAL

The parties agree that $4.31 million of capital was invested in the Bulls by CPSC prior to May 31, 1982 and that this sum should be deducted under the yardstick measure of damages. The parties disagree, however, on whether to deduct $850,000, which was that portion of a $1.2 million capital contribution made in December, 1982. This capital contribution was used to pay CPSC expenses unrelated to this litigation.

For several reasons deduction of the $850,000 would be imprudent. First, it is not clear from the record how much of the $850,000 of capital was used to pay off liabilities accrued prior to May 31, 1982. (See Kovler testimony, D.Tr. at 1157) It would be improper to deduct any capital contribution used to pay off such liabilities because these liabilities were included in the May 31, 1982 financial statements and have already been deducted in the computation of IBI's damages.

Even if all $850,000 had been utilized to fund liabilities accruing subsequent to May 31, 1982, it would not be necessary, or even desirable, for this court to deduct the $850,000. By asking this court to consider the $850,000 contributed by defendants allegedly to cover a $1 million operation loss from June 1, 1982 through December 31, 1982, defendants are asking us to consider only one part of the team's post-May 31, 1982 financial experience. Nowhere is there any accounting for changes in the value of CPSC franchise assets. The value of basketball assets of NBA teams historically have escalated during periods in which capital contributions were required to fund operating losses. Hence, it would not be fair to IBI to reduce its damages by the amount of capital contributions made necessary by recent operating losses without also adjusting IBI's damages upward to take account of the probable appreciation in the value of IBI's basketball assets during the June 1, 1982 to December 31, 1982 period. By the same token, the court will not adjust IBI's damages upward for any anticipated appreciation in value subsequent to May 31, 1982, as this would be unfair to defendants.

### G. SUMMARY OF YARDSTICK MEASURE OF DAMAGES—THE VALUE OF THE CHICAGO BULLS NBA FRANCHISE

The evidence showed that as of May 31, 1982, the market value of the CPSC basketball assets was $11,500,000, the market value of CPSC's other assets was $1,167,602, and the market value of CPSC's liabilities was $1,855,512, resulting in a franchise value of $10,812,090. As CPSC

has invested $4,310,000 in the club, the gain which it has realized is $6,502,090.

Had IBI owned the Bulls, it would have paid $50,000 less in purchase price and would have incurred $1,190,281 less in litigation expenses. IBI, however, would have incurred $3,600,000 in opportunity cost on the equity it would have invested in the Bulls. Adjusting for these factors, the yardstick measure of appreciation in value which IBI would have obtained had it not been prevented from purchasing the club in 1972 is $4,142,371. This amount is the extent to which IBI suffered actual damages.

The court's findings are summarized on the chart below:

| | Plaintiffs | Defendants* | Court |
|---|---|---|---|
| Basketball assets | $15,000,000 | $8,250,000 | $11,500,000 |
| Other assets | | | |
| current assets | 465,983 | 465,983 | 465,983 |
| receivable from NBA | 130,612 | 130,612 | 130,612 |
| notes receivable-players | 346,601 | 346,601 | 346,601 |
| investment securities | 224,406 | 224,406 | 224,406 |
| | $ 1,167,602 | $1,167,602 | $ 1,167,602 |
| | 16,167,602 | 9,417,602 | 12,667,602 |
| Liabilities | | | |
| current liabilities | 1,825,650 | 1,825,650 | 1,825,650 |
| deferred compensation | 1,063,081 | 3,137,837 | 0 |
| settlement due NBA | | | |
| players association | 29,862 | 29,862 | 29,862 |
| | 2,918,593 | 4,993,349 | 1,855,512 |
| Net assets of CPSC | 13,249,009 | 4,424,253 | 10,812,090 |
| Less invested capital | 4,310,000 | 5,160,000 | 4,310,000 |
| | 8,939,009 | (735,747) | 6,502,090 |
| Add: | | | |
| Fishman litigation expense | 1,190,281 | 1,190,281 | 1,190,281 |
| IBI lower purchase price | 50,000 | 50,000 | 50,000 |
| | 1,240,281 | 1,240,281 | 1,240,281 |
| Subtract: | | | |
| Additional arena rent | disregarded | 1,182,000 | 0 |
| Higher interest rate | | | |
| expense on debt | disregarded | see note* | 0 |
| Opportunity cost on equity | disregarded | 8,600,000 | 3,600,000 |
| Basic yardstick measure | | | |
| of damages | $10,179,290 | ($9,277,466) | $ 4,142,371 |

* These calculations differ from defendants' damage calculations because they do not include any adjustment for IBI's increased interest rate and are based solely on CPSC's actual borrowings. See Defendants' Post-Trial Memorandum at 25.

---

## V.

## DISREGARD OF IBI AS PLAINTIFF

Because Mr. Fishman would have owned a maximum of 20% of the Bulls if IBI had acquired the team, defendants contend that it would be inequitable to allow IBI to recover more than 20% of the injury sustained. Plaintiffs argue that there is no inequity or unjust enrichment in IBI's total recovery. The court agrees with plaintiffs and awards to IBI the full amount of damages resulting from plaintiffs' inability to purchase the Bulls in 1972.

The general rule is that a corporation is deemed to be a separate and distinct

legal entity from its shareholders and officers. *Central National Bank v. Fleetwood Realty Corp.*, 110 Ill.App.3d 169, 180, 65 Ill.Dec. 730, 738, 441 N.E.2d 1244, 1252 (1st Dist.1982). In some situations, however, equitable considerations compel a departure from this general rule. The corporate entity will be disregarded when the corporation is merely the alter ego or the business conduit of a dominating personality, or when, under the circumstances, adherence to the fiction of separate existence of the corporation would sanction a fraud or promote injustice. *Central National Bank, supra* at 181, 65 Ill.Dec. at 738, 441 N.E.2d at 1252; *Gallagher v. Reconco Builders, Inc.*, 91 Ill.App.3d 999, 1004, 47 Ill.Dec. 555, 558, 415 N.E.2d 560, 563 (1st Dist.1980).

■ This doctrine of "piercing the corporate veil," when applicable, usually arises in the context of a plaintiff suing a corporate defendant. Although the court does not find that the fact that the doctrine is raised by defendants to limit their liability precludes its application, the court does not believe application of the doctrine is justified under the facts of this case.

Defendants point to the following facts to show that injustice would result from giving IBI a full damage award. Marvin Fishman never planned to be the sole investor in IBI. (Fishman dep. v.9 at 495; L.Tr. at 2124–25) Fishman lacked the funds to consummate the purchase by himself and Continental Bank would not have lent him the funds necessary for an individual investment. (L.Tr. at 4804–05; L.Tr. at 2124–25) Fishman intended to be one of a group of investors who would purchase the franchise. (D.Tr. at 1099–1100; Blumenthal dep. v. 1 at 75–76, dep. v. 2 at 247) The group initially was to include Marvin Fishman, Robert Block, Lloyd Levin, Thomas Nadler, Jonathan Kovler, Harold Paliafito, Robert Paliafito and Eugene Staley. (PX 299; D.Tr. at 1101–02) Two additional investors would have been added who had not committed to the purchase as of July, 1972. (L.Tr. at 3404; D.Tr. at 1102–03; PX 299 at III ¶ 4)

The group incorporated a Subchapter S corporation known as Illinois Basketball, Inc. ("IBI") on June 13, 1972 to be used as a vehicle for the purchase. (DX 153) The initial plan called for each investor to own 10% of the IBI stock (D.Tr. at 1102–03; Fishman dep. v. 2 at 232, v. 2 at 236), with Marvin Fishman having the option of purchasing an additional 10% at a later date as a "finder's fee" for his work in organizing the purchasing group. (L.Tr. at 3403–04; D.Tr. at 1102–03; Fishman dep. v. 5 at 124; Palay dep. v. 1 at 47; Fishman dep. v. 7 at 128–130; L. Levin dep. v. 2 at 26–27; Blumenthal dep. v. 2 at 247–248) Eugene Staley later reduced his share to 5%. (L.Tr. at 3079–80) Each investor would have shared in any proceeds from a resale of the franchise in accordance with his proportionate ownership share of the stock of IBI. (DX 172; L.Tr. at 3121–22; L.Levin dep. v. 2 at 28)

A Subscription and Stockholders Agreement ("Subscription Agreement") (PX 299) formed the basis for the investor's responsibilities as potential stockholders in IBI. The Subscription Agreement provided for its own termination in the event that IBI was unable to purchase the franchise. (PX 299 at § XVI) The only obligations that survived were those pertaining to the expenses incurred by IBI in the attempted purchase and IBI's obligation to indemnify the stockholders with respect to certain types of claims that might have been filed against them. (*Id.*)

All efforts to organize IBI pursuant to the Subscription Agreement ceased when the transfer was not approved by the NBA. (D.Tr. at 1117) No stock was issued in 1972 to the investors who executed the Subscription Agreement. (D.Tr. at 1112–1113)

IBI had incurred various organizational expenses before the NBA refused for the second time to approve the transfer of the franchise to IBI on July 11, 1972. (DX 194; DX 105; DX 316) As specified by the Subscription Agreement, those expenses were the responsibility of the corporation, not the investors. (PX 299 at § XII) IBI,

however, did not pay those expenses. Two of the investors, Marvin Fishman and Robert Block, took out a loan from the North Shore Bank of Milwaukee for $30,000. (Kneser dep. at 11, 18; DX 121; DX 122; DX 288) The proceeds were used to pay all of IBI's organizational expenses. (L.Tr. at 3729-30; DX 288) Marvin Fishman then asked each investor to reimburse him by paying his proportionate share of the expenses. (D.Tr. at 1105-1106; L.Tr. at 3085-86, 3730; DX 316; DX 287; DX 111) All but one of the investors, Jonathan Kovler (who was then an existing owner of the Bulls), paid their share. (D.Tr. at 1105-06; DX 315) Under the terms of the Subscription Agreement, the stockholders had no other obligations to expend funds on any corporate activities. (PX 299; L.Tr. at 3127)

During the period from July, 1972 to August, 1974, IBI conducted no business. Fishman described the corporation as "dormant" or "inactive." (Fishman dep. v. 11 at 67-68, 100-101; DX 239; DX 250A; D.Tr. at 1117; DX 192; DX 244; DX 68) IBI had no assets (DX 291 at No. 142(a)), no property (Fishman dep. v. 7 at 114), and no employees. (DX 68) IBI held no annual stockholders or directors meetings. (DX 98) Its only "business" from 1972 to date has been the filing of various lawsuits. (DX 291 at No. 142(b); Fishman dep. v. 2 at 168, 175, dep. v. 11 at 14)

Fishman, however, reactivated IBI in August of 1974. Fishman contacted the other investors in IBI and asked them whether they would like to join him in a suit seeking redress for the injuries at issue in this case. (DX 98; D.Tr. at 1130-31) All of the other investors declined to join Fishman as parties to any lawsuit. (DX 98; DX 113; L.Tr. at 3086; Fishman dep. v. 2 at 209-210, dep. v. 2 at 223-224) Fishman then caused IBI formally to issue to himself a stock certificate for three shares, representing the ownership of all of the outstanding shares of stock in IBI. (D.Tr. at 1112-1113; Fishman dep. v. 2 at 214, 215; DX 97) This was the first IBI stock ever to issue. (D.Tr. at 1112-1114)

Fishman next convened the first and only meeting of the stockholders of IBI, i.e., a meeting of Marvin Fishman himself, on August 24, 1974, and authorized a change in the by-laws of IBI to reduce the number of directors of IBI to two. Marvin Fishman elected himself and his wife as directors. Fishman and his wife then named themselves and an employee of one of Fishman's realty companies as officers of IBI. (DX 113) Marvin Fishman and his wife, acting as the directors of IBI, then authorized IBI to file this action in IBI's name. (DX 98)

At the direction of counsel for Marvin Fishman (DX 99), the other investors were asked to execute documents entitled "releases," which by their terms granted mutual releases of IBI and the shareholders from unspecified obligations. Most of the other investors executed these releases. (D.Tr. at 1108-1110; DX 71; DX 72; DX 73; DX 87) None of them were paid any money in exchange for the releases. (D.Tr. at 1111; Fishman dep. v. 2 at 260)

Marvin Fishman and IBI filed the first of the lawsuits that have been consolidated in this action on September 30, 1974. The expenses of this litigation were funded solely by Marvin Fishman until 1979 and were not run through an IBI bank account. (D.Tr. at 1114-1115; Fishman dep. v. 11 at 67-68, 71-72) After the NBA settled with plaintiffs in early 1979 (DX 444), IBI began to pay the expenses of this litigation using the money received from the NBA in the settlement. (D.Tr. at 1130)

Based upon these facts, defendants assert that this court should pierce the IBI "corporate veil". In sum, they point out that at present, Marvin Fishman and his immediate family members own all of the stock of IBI. (D.Tr. at 1099) Marvin Fishman and his family will thus obtain 100% of the financial benefit of any damage award to IBI for the appreciated value of the Bulls. If IBI had purchased the franchise in 1972, Marvin Fishman would have owned no more than 20% of IBI at this time. (L.Tr. 3403-3404) If IBI sold the franchise in 1982, he would have received no more

than his proportionate share of the proceeds, *i.e.*, 20%. (D.Tr. at 1102–03; Fishman dep. v. 10 at 77, 78–79) If this court awards damages to IBI, Marvin Fishman will receive, defendants argue, five times his actual damages as an investor in IBI. After trebling, Fishman would receive fifteen times his actual injury.

As indicated above, the corporate entity will only be disregarded in very limited circumstances, such as when recognition of the corporate form will sanction a fraud or promote injustice. Certainly there is no issue of fraud here. The narrow question is whether the granting of a 100% recovery to IBI would promote injustice.

This court finds no reason for disregarding the corporate form and denying full recovery to IBI. The injury sustained by IBI was the same, regardless of the identity of its shareholders. In his role as sole shareholder, Mr. Fishman pursued claims which belonged to the corporation.

The court finds no element of "unjust enrichment" to Mr. Fishman in awarding full recovery to IBI. Before commencing this litigation, Mr. Fishman obtained releases from his co-investors, giving him a total interest in the litigation. As sole shareholder, Mr. Fishman bore the risk of the litigation, and committed the money, time and energy necessary to obtain a remedy.

Even if this court were to accept (which the court does not) that giving a full damages award to IBI would result in overcompensating Fishman, this still would not constitute injustice to defendants. Defendants' actions deprived IBI (and indirectly the Fishman investor group) of the benefits they would have received had IBI acquired the team. These benefits, under the yardstick measure, total $4,142,371. This is the amount of injury which defendants caused IBI and the Fishman investor group. The fact that some of the investors chose not to commit the time and money and subject themselves to the stress and inconvenience involved over many years in prosecuting a complex antitrust case to remedy the injury to their business in no way diminishes the fact of injury. This court sees nothing unjust in requiring defendants to pay the full amount of the harm they caused.

This result is fully consistent with the deterrence policy behind the antitrust laws. If IBI were given only 20% of its damages, defendants would escape from this litigation with a franchise which had appreciated in value greatly—a franchise they never should have obtained. Even after trebling the 20% of full damages, defendants would have profited handsomely, a result clearly at odds with antitrust policy.

Defendants' reliance upon the equitable doctrine announced in *Bangor Punta Operations, Inc. v. Bangor Aroostook Railroad Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), is misplaced. In *Bangor Punta*, the Court determined that "[a]lthough a corporation and its shareholders are deemed separate entities for most purposes, the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy." 417 U.S. at 713, 94 S.Ct. at 2584. In the present case, however, there is no evidence that IBI's corporate form was being used to defeat an "overriding public policy." The court, therefore, holds that IBI is entitled to a full recovery of the amount of damages sustained.

## VI.

### PLAINTIFF MARVIN FISHMAN'S DAMAGES

█ As to plaintiff Marvin Fishman's damages, the evidence showed that he was to receive a salary of $50,000 to $60,000 per year for acting as chief executive officer of IBI. Although his initial contract was to be for three years only, plaintiffs contend that it is reasonable to infer that he would have continued in that position thereafter.[20]

---

20. It was agreed by several of the principals of IBI that Marvin L. Fishman would be employed as chief executive or operating officer of IBI for an initial period of three years at a salary of $50,000–60,000 per year. (*See* testimony of Robert Block, L.Tr. at 3648–9; testimony of A.E. Staley III, L.Tr. at 3083; testimony of Marvin Fishman, L.Tr. at 3405; Lloyd Levin dep. vol. I

Plaintiffs state that the evidence shows that from 1972 through May 31, 1982 CPSC paid its principals approximately $318,000 as executive salaries or consulting fees.[21] Plaintiffs, therefore, conclude it is reasonable to assess Mr. Fishman's damages at $318,000.

Defendants first contest the $318,000 figure on the grounds that it does not accurately represent the total compensation paid by CPSC over the last ten years to its chief executive officers. CPSC paid only $258,000 to its chief executive officers. From 1972 to 1982, CPSC paid a total of $258,000 in chief executive salaries: $30,000 in 1972–73; $7,500 in 1975; $18,500 in 1976; $24,000 in 1977; $34,000 in 1978; and $36,000 in 1979, 1980, 1981 and 1982. (Mandel dep. at 72, 152, 153, 154, 155; L.Tr. at 84–86; DX 677; DX 717; PX 530; PX 531; PX 532)

From 1976 to 1979, however, CPSC paid Albert Adelman a total of $60,000 in fees for consulting services rendered after Adelman sold his CPSC stock. (Mandel dep. at 72, 152, 153, 154, 155; L.Tr. at 84–86, 1974) The total consulting fees and chief executive salaries paid by CPSC during this period total $318,000.

Although there is no guarantee that Fishman would have retained his position as IBI chief executive from 1972–82, the court agrees with plaintiff that it is reasonable to infer that he would have. Defendants are correct that CPSC paid its chief executive only $258,000 over that time period and it is only by adding to it the $60,000 in consulting fees paid to Adelman that the $318,000 figure is reached. The $318,000 sought by Fishman for lost salary, however, is still a conservative figure in view of the probability that he would have continued in the employ of IBI for the whole ten year period. The court, therefore, finds that Fishman would have earned

$318,000 from IBI had defendants not prevented IBI from acquiring the Bulls.

Defendants also contend that it is necessary to offset against that sum the monies earned or which reasonably could have been earned by Fishman in his real estate business by virtue of his own work efforts over the full ten year period.

The evidence shows that Fishman's position as chief executive of IBI would have been a full-time job (DX 172; L.Tr. at 3678, 3817; L. Levin dep. v. 3 at 10), requiring "constant attention." (Fishman dep. v. 1 at 119) He would have commuted almost daily from Milwaukee to Chicago. (L.Tr. at 3818; Fishman dep. v. 1 at 118, v. 7 at 139, v. 12 at 36–37)

The time commitment to the Bulls would have had a negative impact on Fishman's real estate business in Milwaukee. (Fishman dep. v. 5 at 48–49; Chernof dep. v. 1 at 35–36) He would have had to give up any new construction. (Palay dep. v. 1 at 36–37; Fishman dep. v. 11 at 38) He would not have been able to work full-time at the offices of the M.L. Fishman Realty Co., which he has done since 1972. (D.Tr. at 1122–1123; Fishman dep. v. 12 at 13) He would have had to give up "real estate development." (Fishman dep. v. 1 at 118) He would not have been able to sell real estate. (Palay dep. v. 1 at 30–31) He would not have been able to devote as much time to managing his $1 million investment in real estate. (D.Tr. at 1132–33) As a result, Marvin Fishman's income from his real estate business would have been less if he had been operating the Chicago Bulls franchise. His various real estate ventures require his daily attention. (Fishman dep. v. 12 at 13; D.Tr. at 1123) They represent a "full-time job" (*id.*), at which he works "very hard," sometimes even working through lunch. (D.Tr. at 1123; Fishman dep. v. 12 at 13, 18–19) Marvin

at 39; Arthur Blummenthal dep. vol. II at 245; Harold Paliafito dep. at 63–64. *See also* DX 499 (draft of employment agreement).)

**21.** CPSC paid H. Jonathan Kovler, James Cook and Albert Adelman executive salaries and consulting fees totaling $318,000 from 1972 to

5/31/82. (Defendants' Response to Plaintiffs' November 9, 1982, Interrogatories, No. 1 at 4; PX 529–532, 716–721; CPSC U.S. Income Tax Returns for 1972–1981; testimony of Albert Adelman, L.Tr. at 84–87)

Fishman could not have been employed full-time in his real estate business if he had also been employed in the full-time position of chief executive officer of IBI.

Marvin Fishman earned money from his real estate activities from 1972 to date. He reported wages of $10,000 in 1972. (DX 89; Fishman dep. v. 11 at 18) He earned real estate commissions of $8,422 in 1972 (D.Tr. at 1127–28; Fishman dep. v. 11 at 42–43, 41), the difference between the total commissions of M.L. Fishman Realty ($24,-246) and the commissions earned by the other salesmen ($15,824). On the same basis, he reported commissions of $9,986 in 1973; $4,717 in 1974; $19,819 in 1975; $21,-112 in 1976; and $14,602 in 1977. (DX 89) In addition, Fishman reported wages of $1,200 in 1976. (*Id.*) This income could not have been earned if Marvin Fishman had been the chief executive of IBI without incurring additional costs for other employees. (Palay dep. v. 1 at 29–31) Fishman also testified that he earned $60,000 in 1981 and 1982 and slightly less in the preceding year or two. (Fishman dep. v. 12 at 13–15) Further, M.L. Fishman Building Corp. accumulated between $50,000 and $100,000 during the period from 1972 to 1982 that he elected not to distribute to himself and his wife, the corporation's only shareholders. (D.Tr. at 1122, 1124) Consequently, his total income from full-time real estate work from 1972–82 was about $319,858 to $369,-858.

Mr. Fishman earned more than $318,000 from his labors on behalf of his real estate ventures during the 1972–82 period. If Fishman had been working full-time for IBI and commuting almost daily to Chicago, he could not have earned these sums. Consequently, Fishman can recover no damages on his lost salary claim.

## VII.

### EQUITABLE RELIEF

■ When a defendant tortiously interferes with a plaintiff's contract and obtains unique personal property to which plaintiff was entitled, a court may award plaintiff restitution of the property. (*See infra* Conclusions of Law at Section III.) Equitable relief, however, is not granted as a matter of right. Rather, such relief is granted in accordance with the sound discretion of the court, as dictated by settled principles of equity. One of these principles mandates a court of equity to refuse to grant specific relief where the harms and difficulties it would create for the parties, for third persons and for the court are disproportionate to the advantages to be gained from enforcement. For several reasons, the court finds that the harms and difficulties outweigh the benefits of specific relief in the present case.

■ The first practical problem which would result from a decree of equitable relief is that it would force upon innocent third persons a business relationship which they did not choose to enter into. At present, approximately 35% of the stock of CPSC is owned by Lamar Hunt, Jonathan Kovler, Walter Shorenstein and George Steinbrenner. (DX 673) Two of the present owners, Jonathan Kovler and Lamar Hunt, owned shares of CPSC in 1972. (PX 156) These individuals are not defendants in this litigation and do not stand accused of any wrongdoing in this case. It would be unfair to require them to forfeit their stock in the franchise. It would also be unfair to force them into a minority position in a closely held corporation with a single controlling shareholder whom they did not choose as a business partner. This harm to the interests of innocent third persons militates against specific relief.

The second practical problem that would result from a decree of equitable relief is that it would force a business relationship on the parties which would undoubtedly result in additional litigation or extended court supervision. For example, while the parties have not made clear what effect an equitable transfer of ownership would have upon the Bulls' continued involvement in pay TV, the court notes that certain difficulties would undoubtedly arise. If IBI were awarded the Bulls' franchise, difficulties would almost certainly arise between

886

IBI and one or more of Circular TV Communications, Sportsvision or the Sportsvision joint venturer representing the Chicago Blackhawks (the party executing. the Sportsvision Joint Venture Agreement on behalf of the Blackhawks was Wirtz TV Productions, Inc., by Arthur Wirtz). It does not require a great deal of imagination to envision the tension in any such forced relationship.

In addition, difficulties might well arise in making arrangements for a proper playing facility. In order to effect a meaningful decree permitting IBI to successfully operate the Bulls franchise, the court would have to ensure that IBI had a suitable facility in which to play basketball games. Although the presence of the Rosemont Horizon does inject competition into the market for the exhibition of professional basketball and, thereby, increase the value of the Bulls franchise, it was not clear from the evidence that the Horizon would be available anytime in the immediate future due to presently scheduled college basketball games and other planned activities. Therefore, it is possible that, at least for some period of time, the court would have to enjoin defendants from further excluding plaintiffs from the market for the presentation of live professional basketball in the Chicago metropolitan area by refusing to lease the Chicago Stadium.

These are just a few of the potential problems which come readily to mind when considering specific performance. In essence, by ordering a transfer of the control of the Bulls, the court could be imposing upon the parties and the court a forced business relationship—a relationship which probably would be strained from its inception. This court refuses to enter an order which could create such a situation. *See Texas & P.R. Co. v. Marshall*, 136 U.S. 393, 10 S.Ct. 846, 34 L.Ed. 385 (1889) (Court will not specifically enforce perpetual obligations of a contract); *Ambassador Foods Corp. v. Montgomery Ward & Co.*, 43 Ill. App.2d 100, 192 N.E.2d 572 (1963) (court refused to enforce specifically a contract which required the "performance of varied and continuous acts"); *Florida Jai Alai,*

*Inc. v. Southern Catering Services,* 388 So.2d 1076, 1078 (Fla.App.1980) (refusal to grant equitable decree requiring perpetual supervision). *See also* 71 Am.Jur.2d, *Specific Performance* § 90 (1973).

Finally, as has been noted elsewhere in this Opinion, the amount of monetary damages are determinable and provide an adequate remedy. For all of these reasons, the court declines to grant specific relief to plaintiffs on their common law and antitrust claims.

## VIII.

### THE SETTLEMENT WITH THE NBA DEFENDANTS

Prior to 1979, the NBA and owners of several of its member teams, Atlanta Hawks Basketball, Inc.; Abe Pollin; Madison Square Garden Center, Inc.; California Sports, Inc.; Capital Bullets, Inc.; Missouri Valley Pro Sports, Inc.; and Texas Sports Investments, Inc., (the "NBA defendants"), were defendants in this action. The claims against the NBA defendants were identical in substance to those asserted against the defendants here. All of the defendants were alleged to have been co-conspirators, jointly and severally liable to the plaintiffs. In December, 1978, plaintiffs settled their claims against the NBA defendants for $750,000 (DX 444) and dismissed their claims against them. The court must deduct this amount from plaintiffs' damage award.

## IX.

### PUNITIVE DAMAGES

Defendants argue that punitive damages are inappropriate on the facts of the case. CPSC and its investors were competitors of IBI for the acquisition of the Bulls in 1972. Their conduct was not intended to injure or harm plaintiffs. Defendants conclude that their misconduct did not extend beyond that necessary to constitute the basis of the underlying common law cause of action.

Plaintiffs contend that punitive damages are justified on the basis of this court's findings in the liability trial. In this court's Findings of Fact and Conclusion of Law dated October 28, 1981, the court specifically found that the defendants intentionally, with malice, and without justification, interfered with IBI's contractual rights and economic relations.[22]

Defendants, acting individually and jointly, and in conspiracy with each other, intentionally interfered with plaintiff IBI's contractual rights and economic relations, and did so willfully, with malice, without justification, and with wanton disregard for the law and the rights of others. In consequence, the circumstances of this case warrant the imposition of substantial punitive damages against certain tort-feasors.

In consideration of their respective culpability and wealth, punitive damages should be assessed, severally against certain of the tort-feasors as follows:

(i) Estate of Arthur Wirtz, $2,000,000;

(ii) William Wirtz, $500,000;

(iii) Lester Crown, $2,000,000;

(iv) Philip Klutznick, $0;

(v) Chicago Professional Sports Corporation, $0;

(vi) Chicago Stadium Corporation, $0.

## X.

### INCORPORATION OF CONCLUSIONS

All conclusions of law deemed to be findings of fact are incorporated herein by reference.

**22.** Plaintiff refers to the following passages in this court's Findings of Fact and Conclusions of Law from the liability trial:

*Page 143:* "The defendants, by causing NBA members to deny approval to plaintiff, intentionally interfered with plaintiff's contractual rights. The fact that the NBA members, 'had such malicious interference not been exercised, might have had the right to so act, does not relieve them from tort liability.'"

*Page 147:* "The coercive nature of defendants' conduct of withholding that arena from plaintiffs and of directly warning the NBA that the arena [Chicago Stadium] would not be available [sic] if the transfer to plaintiffs was approved intentionally and without justification interfered with plaintiff's contractual relationship with CPBC."

## CONCLUSIONS OF LAW

### I.

### THE LEGAL MEASURE OF PLAINTIFFS' DAMAGES

Under the antitrust laws, a successful plaintiff is entitled to recover for all of the "financial advantages" lost as a result of defendant's unlawful conduct. This is particularly true when the antitrust violation has forced the plaintiff out of business. As the court succinctly explained in *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir.), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972), the issue is simply:

[W]hat financial advantage would the [excluded] plaintiff have gained but for the actions of the defendant? 464 F.2d at 47.

This is the same "but for" concept that is often applied in common law tort cases. In *Albrecht v. Herald Co.*, 452 F.2d 124 (8th Cir.1971), the court, in referring to damages available under Clayton Act, 15 U.S.C. § 15, said:

The damages referred to in the [federal anti-trust] statute should be construed in the ordinary common law context as compensating plaintiff in full for the preventable and established loss sustained by reason of tortious or proscribed acts. 452 F.2d 127–28.

*Accord, Independence Tube Corp. v. Copperweld Corp.*, 691 F.2d 310, 328 (7th Cir.

*Pages 148–49:* In discussing defendants' contention that there was no malice on their part, the court cited Illinois law that interference with contract does not depend upon the traditional concept of malice, but a finding of malice can depend upon a determination that the wrongful act was done intentionally and without just cause. This court then stated, "In the instant case, it is clear that defendants not only acted without justification or a privilege but additionally acted unlawfully."

In this court's order of February 14, 1983, granting plaintiffs' motion to conduct net worth discovery of certain defendants, the court referred to the "previous ruling that defendants' conduct was intentional, malicious and without justification." (Order of February 14, 1983 at 3)

1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 3109, 77 L.Ed.2d 1365 (1983).

■ Contrary to the contention of the present defendants, damages are not limited to those which accrued as of the date of the unlawful conduct.[23] As stated by Justice Cardozo in *Sinclair Refining Co. v. Jenkins Petroleum Process Co.,* 289 U.S. 689, 699, 53 S.Ct. 736, 740, 77 L.Ed. 1449 (1933), the "law is not so tender" to wrongdoers as to let them imagine a forced sale of plaintiff's property and then measure the damages by its probable result. In *Sinclair* the defendant had wrongfully deprived plaintiff of a patent whose value was difficult to determine at the time of the taking. Notwithstanding defendants' objections, the Supreme Court held that plaintiff could properly introduce evidence of the use *subsequently* made of the patent by the defendant in order to prove plaintiff's damages. *Id.* at 699, 53 S.Ct. at 739.

This principle is equally applicable in antitrust cases. In *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), the Supreme Court specifically noted that a plaintiff may:

... recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, *including what he has suffered during and will predictably suffer after trial.* 401 U.S. at 339, 91 S.Ct. at 806 (emphasis added).

*Accord, Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 669 F.2d 490, 494 (7th Cir.), *cert. denied,* 459 U.S. 257, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982) ("... plaintiff is entitled to recover all damages ... including damages that will be suffered during and after trial."); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 23 n. 12 (5th Cir.), *cert. denied,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974) ("[It] would make a mockery of the private antitrust remedy" to limit plaintiff to the going-concern value of his business at the date of its

destruction); *Lehrman v. Gulf Oil Corp., supra; William Goldman Theatres v. Loew's, Inc.,* 69 F.Supp. 103, 105 (E.D.Pa. 1946), *aff'd,* 164 F.2d 1021 (3rd Cir.1948); *A.C. Becken Co. v. Gemex Corp.,* 314 F.2d 839, 840 (7th Cir.1963); *Lawlor v. Loewe,* 235 U.S. 522, 536, 35 S.Ct. 170, 172, 59 L.Ed. 341 (1915).

Nor can defendants complain that the passage of time between their unlawful conduct and the trial has served to increase damages. Rather, as explained in *Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp.,* 194 F.2d 846, 856 (8th Cir.), *cert. denied,* 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952), the passage of time merely permits proof of the "extent of the harm."

■ Consistent with the foregoing principles, plaintiff IBI is entitled to recover damages based upon the value of the business it would have owned as of the time of trial.

Similar approaches are reflected in many cases. For example, in *Magnus Petroleum Co. v. Skelly Oil Co.,* 446 F.Supp. 874 (E.D.Wis.1978), *rev'd on other grounds,* 599 F.2d 196 (7th Cir.), *cert. denied,* 444 U.S. 916, 100 S.Ct. 231, 62 L.Ed.2d 171 (1979), plaintiff was prevented by reason of an antitrust violation from acquiring a business in 1971. He was permitted to recover for lost profits from 1971 to the date of trial, and for the lost good will (*i.e.,* increase to going-concern value) as of the time of trial. 446 F.Supp. at 882–83.

Similarly, in *Photovest Corp. v. Fotomat Corp.,* 1977–1 Trade Cases (CCH) ¶ 61,529 (S.D.Ind.1977), *aff'd in pertinent part,* 606 F.2d 704 (7th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980), the plaintiff's business had been injured in 1974 by acts of monopolization. The trial court concluded that from 1974 to September, 1976 (just prior to the commencement of trial) the plaintiff would have earned $124,305 "but for the defendant's wrongful acts." In addition to

---

**23.** Defendants contend that IBI is limited to the difference between the price it would have paid for the Chicago NBA franchise in 1972 and its fair market value as of 1972.

awarding those lost profits, the court also held:

> The value of plaintiff's business at the time of trial was zero. Its value in September, 1976, and thereafter would have been $500,000 but for defendant's wrongful acts. 1977–1 Trade Cases (CCH) ¶ 61,529 at 72,094.

Accordingly, plaintiff was awarded $124,305 in lost profits to the date of trial plus the $500,000 going concern value that his business would have had at the date of trial. *Id.* at 72,095.

On appeal, the Seventh Circuit affirmed the monopolization award, but held that an unrelated tying claim had not been proven. Accordingly, it remanded the case, but only to delete the damages assessed on account of the tying claim. 606 F.2d at 724. The court explicitly held that "the bulk of the damages awarded for attempt to monopolize have been affirmed." 606 F.2d at 731.

Other cases are similar. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Arnott v. American Oil Co.*, 609 F.2d 873 (8th Cir.1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *Atlas Bldg. Prod. Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950 (10th Cir.1959); *Atlantic City Electric Co. v. General Electric Co.*, 226 F.Supp. 59, 61 (S.D.N.Y.), *appeal denied*, 337 F.2d 844 (2d Cir.1964) (antitrust plaintiff may recover both for past lost profits and for decrease in value of investment).

Clearly, the damages sought by plaintiffs in this case fall squarely within the above stated legal principles.

Given these legal principles, the next question is the appropriate standard of proof to be applied in assessing damages. To prove a just and reasonable estimate of their own damages, antitrust plaintiffs frequently rely on the financial experience of similar businesses. Plaintiffs refer to this as the "yardstick" approach to proving damages.

The yardstick approach has been utilized and accepted in many cases. *See, e.g., Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 257–8, 66 S.Ct. 574, 576–7, 90 L.Ed.2d 652 (1946) (plaintiff compared his theatre with a competitor, "the two being comparable in size," but plaintiff's "being superior in location, equipment, and attractiveness to patrons"); *Lehrman v. Gulf Oil Corp., supra*, 464 F.2d at 42 (plaintiff compared his gas station to three other service stations); *William Goldman Theatres v. Loew's, Inc., supra* at 108 (plaintiff, who was excluded from "first run" movie theatre business, was permitted to introduce financial experience of other "first run" theatres in Philadelphia); *Richfield Oil Corp. v. Karseal Corp.*, 271 F.2d 709, 714 (9th Cir.1959) (plaintiff compared his sales to a competitor's sales); *North Texas Producers Ass'n. v. Young*, 308 F.2d 235, 243–45 (5th Cir.1962), *cert. denied*, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963) (plaintiff excluded from commencing a dairy business in Texas introduced financial data from the Kansas City market and from other Texas dairies); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1190 (D.C. Cir.1978) (football player's salary compared to a free agent's salary to determine what he would have been paid in an unrestricted market).

In the present case, the evidence provided a particularly reliable and appropriate "yardstick." Defendant CPSC acquired and operated the very same business sought by plaintiffs and did so continuously from the time of the unlawful conduct through the time of the damages hearing.

Under these circumstances, there can be no question that CPSC's gain provides an appropriate measure of IBI's damages. For example, in *Haverhill Gazette Co. v. Union Leader Corp.*, 333 F.2d 798 (1st Cir.), *cert. denied*, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964), the plaintiff and defendant were competing to be the sole survivor in a natural monopoly market. With regard to plaintiff's damage calculations, the court stated:

> In the antitrust case at bar uncertainty of cause is much less than it would be in the ordinary multi-competitor situation because until the Journal appeared in

this admittedly one-newspaper area, Gazette had no competition, and if the Journal had ceased publication it would have reverted to that status. *In a very arguable sense whatever the Journal took, particularly after the strike ended, Gazette lost.*" 333 F.2d at 806 n. 16 (emphasis added)

Similarly, in *Household Goods Carriers' Bureau v. Terrell,* 417 F.2d 47 (5th Cir. 1969), the court specifically approved using defendant's financial experience as a measure of plaintiff's losses where defendant wrongfully appropriated plaintiff's business.

> In *Cherokee [Laboratories, Inc. v. Rotary Drilling Services, Inc.,* 383 F.2d 97 (5th Cir.1967)]* ... the defendant *replaced* the plaintiff as *sole* distributor of the product. Thus the court held that the plaintiff was justified in relying on the only figures available, i.e., those of the defendant after it had replaced plaintiff as sole distributor. 417 F.2d at 53 (emphasis added)

The decision in *Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., supra,* is also directly on point. In that case the plaintiff held a 15-year lease on a movie theatre. The defendant forced him out of business and then acquired the remainder of his leasehold. To support his damage claim, plaintiff introduced evidence of the defendant's financial experience. In affirming the use of such evidence, the Eighth Circuit said:

> ... defendants are not in a position to complain of the charge [to the jury] with reference to how this evidence [of defendant's financial experience] might be considered by the jury. If profits that might reasonably be realized from the conduct of a business destroyed by the tortious act of wrongdoers may not be taken into consideration, then the wrongdoer might with impunity destroy a competitor's business and profit by such wrongful act. 194 F.2d at 855–56.

▆ Finally, the policy of preventing a defendant from profiting from his own wrongdoing is so strong that where a plain-

tiff cannot otherwise show his losses he is entitled "to the full amount of defendant's profits" even where "the defendant has contributed other elements of value or utility." *Bigelow v. RKO Radio Pictures, supra* 327 U.S. at 265, 66 S.Ct. at 580. In commenting on this aspect of the *Bigelow* case, one commentator has said:

> It would seem to follow that where a business conspiracy ... has excluded a plaintiff from a business ... a measure of damages is applicable on the basis of the benefit the wrongdoer has obtained from his wrongful conduct. McConnell, *The Treble Damage Action,* 1950 U.Ill. .L.F. 659, 668 (1950).

This principle has been adopted in a long line of cases. *See, e.g., Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (only by requiring violators to disgorge the "fruits of their illegality" can the deterrent objectives of the anti-trust laws be fully served); *U.S. v. Grinnell Corp.,* 384 U.S. 563, 577, 86 S.Ct. 1698, 1707, 16 L.Ed.2d 778 (1966) ("[a]dequate relief in a monopolization case should ... deprive the defendants of any of the benefits of the illegal conduct ..."); *International Boxing Club of N.Y. v. United States,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959) (it is necessary to deprive the defendants of the benefits of their conspiracy). In sum, IBI is entitled to recover damages based upon the value of the business it would have owned as of the time of trial but for defendants illegal actions, and this value is appropriately determined by use of the "yardstick" measure of damages.

## II.

## OPPORTUNITY COST

▆ Opportunity cost, imputed interest, or return on capital have been recognized in numerous cases, and should likewise be recognized here. Opportunity cost has been recognized in antitrust cases as "return on capital" where, in the context of determining damages for lost going concern value, the court first deducted a rea-

sonable return on the owner's investment before calculating any profit. *See, e.g., Kestenbaum v. Falstaff Brewing Corp.,* 575 F.2d 564, 574 (5th Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); *Simpson v. Union Oil Co. of California,* 411 F.2d 897, 909–10 (9th Cir.), *rev'd on other grounds,* 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969); *Standard Oil Co. of California v. Moore,* 251 F.2d 188, 219–20 (9th Cir.1957). Opportunity cost is well recognized in the Seventh Circuit in other contexts, particularly in calculating whether a railroad operation has been profitable in railroad application for abandonment cases. *Simmons v. United States,* 698 F.2d 888, 897–98 (7th Cir.1983); *People of State of Illinois v. Interstate Commerce Comm'n.,* 698 F.2d 868, 875 (7th Cir.1983); *International Minerals & Chemical Corp. v. Interstate Commerce Comm'n.,* 656 F.2d 251, 259 (7th Cir.1981).

While it is appropriate to take opportunity cost into account, the rate utilized should be that corresponding to the most nearly riskless investments available on the market. A plaintiff's obligation to mitigate damages extends only to virtually risk-free alternatives:

> It is never necessary to expend time or money in an effort to avoid injurious consequences unless the advantage to be derived from such expenditure *is almost certain.* The plaintiff is not required to run the risk of increasing his losses. 5 Corbin, Corbin on Contracts § 1042 at 264 (1964) (emphasis added)

Likewise, in *R.E.B., Inc. v. Ralston Purina Co.,* 525 F.2d 749 (10th Cir.1975), the court explained:

> It is not required that the injured party incur hazards, and so if the expenditures [to mitigate] would be substantial, the injured party is excused from making a new investment. 525 F.2d at 756.

*See* 22 Am.Jur.2d *Damages* § 37 (1965). *Accord,* 11 Williston, A Treatise on the Law of Contracts § 1353 at 277 (3d ed. 1968) ("Almost any risk of considerable loss to the injured person if he attempts to

mitigate damages should be considered undue."). As U.S. Treasury bills are the most nearly riskless security available on the market, the interest rate on these securities may appropriately be used as the opportunity cost rate.

## III.

### EQUITABLE RELIEF

It is clear at common law that when a defendant tortiously interferes with a plaintiff's contract and, as a result, obtains a performance that should have gone to the plaintiff, the court is authorized to grant plaintiff restitution of the benefits received by the defendant. *Second National Bank v. Samuel & Sons,* 12 F.2d 963 (2d Cir.1926); *National Merchandising Corp. v. Leyden,* 370 Mass. 425, 348 N.E.2d 771 (1976); 1 G. Palmer, The Law of Restitution § 2.6 (1978). It follows that when the performance that is wrongfully obtained by the defendant includes a unique chattel, the defendant may be deemed to hold the chattel upon a constructive trust for the plaintiff and the plaintiff can maintain a bill in equity for specific restitution of the chattel. *See* 1 G. Palmer, The Law of Restitution § 1.4 (1978); Restatement of Restitution, §§ 128, 160 (1937).

Whether equitable relief is granted, however, is a matter left to the sound discretion of the court. Where the harms and difficulties created by the imposition of equitable relief to the parties, to third persons and to the court outweigh the advantages to be gained from enforcement and the harms suffered from denial, the court should deny the equitable remedy. *See* Restatement (Second) of Contracts § 366 (1981).

For the reasons stated under Findings of Fact, *supra* at Section VI, the court concludes that the difficulties and harms clearly outweigh the benefits of awarding equitable relief, and the court therefore denies specific relief.

## IV.

### ABATEMENT OF PUNITIVE AND TREBLE DAMAGES UPON DEATH

■ The death of Arthur Wirtz during the pendency of these proceedings has led his estate to seek dismissal of plaintiff's claims for punitive and treble damages as to him. While no Illinois court has directly addressed the issue, the overwhelming majority of decisions from other jurisdictions have held that an award of punitive damages is barred where the wrongdoer dies before final judgment is entered. *Barnes v. Smith,* 305 F.2d 226 (10th Cir.1962); *Paul v. Milburn,* 275 F.Supp. 105 (W.D. Tenn.1967); *Amos v. Prom, Inc.,* 115 F.Supp. 127 (N.D.Iowa 1953). In the view of this court, however, the proceedings in this case had progressed to the extent necessary at the time of his death to form an exception to this rule. *See In re Marriage of Davies,* 95 Ill.2d 474, 70 Ill.Dec. 4, 448 N.E.2d 882 (1983). Thus, plaintiff's claim for punitive damages against defendant Arthur Wirtz did not abate upon his death.

While the majority of decisions from other circuits would require a different result with respect to plaintiff's claim for treble damages, the court refuses to find that plaintiff's claim for treble damages abated upon Wirtz's death. The decisions holding that a claim for treble damages abates upon the death of the wrongdoer are premised upon the belief that such damages are punitive in nature. *See e.g., Rogers v. Douglas Tobacco Board of Trade,* 244 F.2d 471 (5th Cir.1957). Recent Supreme Court decisions, however, have made clear that the primary purpose of treble damages is remedial and not punitive. *American Society of Mechanical Engineers v. Hydrolevel Corp.,* 456 U.S. 556, 559, 102 S.Ct. 1935, 1938, 73 L.Ed.2d 330 (1982) and *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). *See also Smith v. No. 2 Galesburg*

*Crown Finance Corp.,* 615 F.2d 407, 415 (7th Cir.1980). Thus, the court finds the plaintiff is entitled to recover punitive damages against Wirtz's estate.

## V.

### SUMMARY

■ Divestiture of the assets of the Chicago Bulls would be improper under the circumstances of this case. Monetary damages are both calculable and adequate. Moreover, substantial harm and difficulties would be created for the parties, third persons, and the court by a decree of equitable relief. Consequently, the court must deny the request for the transfer of assets to plaintiffs, and will, instead, award the following legal remedies:

Plaintiff IBI has been injured and damaged in its business and property as a result of defendants' antitrust violations in the amount of $4,142,371.[24] Pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, IBI's damages are trebled to $12,427,113. Plaintiff IBI has also been injured and damaged in its business and property by defendants' intentional interference with its contractual relations and prospective business advantages in the amount of $4,142,371. Defendants acted willfully, with malice, and without justification. Consequently, the circumstances of this case warrant the imposition of punitive damages against certain defendants. *See* Findings of Fact, *supra* Section IX.

Plaintiff Fishman has been injured and damaged in his business and property as a result of defendants' antitrust violations in the amount of $0.00. Therefore, no trebling of Fishman's damages pursuant to section 4 of the Clayton Act, *supra,* will occur.

The $750,000 received by plaintiffs in settlement of their claims against certain former defendants alleged to have been

---

**24.** Defendants' act resulted in liability to plaintiffs under both antitrust and common law tort theories. The liability under each theory, however, covers a single harm to plaintiffs flowing from the same acts. Thus, the liability under antitrust and common law theories is not cumulative. Nevertheless, plaintiffs are entitled to recover under the theory which results in the higher damages award.

co-conspirators must be deducted from plaintiffs' award after trebling. These former defendants were jointly and severally liable with the remaining defendants for the violations subsequently found by this court following the liability stage of the trial.

Plaintiffs are entitled to the cost of suit and their reasonable attorneys' fees pursuant to section 4 of the Clayton Act, *supra*. Accordingly, plaintiffs shall file their application for costs and fees within fourteen (14) days hereof. This court shall enter judgment against defendants upon resolution of this remaining issue.

All findings of fact deemed to be conclusions of law are incorporated herein by reference.

Several closing comments are in order. In 1972, both plaintiffs and defendants wanted to purchase the Chicago Bulls. After a bitter struggle, defendants emerged as the new owners of the franchise. Neither the struggle for control, nor the bitterness between the parties has abated with the passage of time. To this day, plaintiffs maintain that they still want to own the Chicago Bulls. Conversely, defendants want to hold on to the team. Moreover, throughout this most recent stage of the litigation, the parties have been sharply divided on the principal issues of the value of the team and the quality of each parties' managerial skills.[25]

The court suspects that the intensity of this litigation has caused the parties either to overstate or understate their positions in several instances. Out of necessity the court has been required to make decisions in this Opinion that are at variance with the positions of both parties. If the estimate of the value of the team propounded by defendants were accurate, for example, a prospective buyer of the team would receive a bargain for a purchase price totally out of line with those for comparable NBA franchises. Similarly, if plaintiffs estimate were accurate, a buyer of the Bulls would pay more for the team than it is actually worth.

As a result of the court's decision that legal relief is adequate and that equitable relief is, therefore, not appropriate, re-evaluation by the parties of their longstanding positions may be desirable. It is with some irony that the court notes that the effect of the substantial judgment against defendants may be to place the Chicago Bulls in a marketable posture. After satisfying the judgment, defendants may no longer be able to afford the team. Plaintiffs, on the other hand, may desire to apply the damages award toward a new offer to purchase the team. If the parties are willing to deal with one another afresh, a neutral intermediary may be of some assistance in attempting to negotiate a possible sale. The court would be willing to conduct initial conferences between the parties in order to discuss the feasibility of this alternative.

Based on the foregoing Findings of Fact and Conclusions of Law, plaintiffs are directed, within thirty (30) days, to prepare and submit an appropriate Judgment Order for each defendant.

---

25. For example, plaintiffs have argued vociferously that the value of the Bulls basketball assets is at least $15 million, and that the value of the stock of the club is over $10 million after certain adjustments are made. With equal vigor defendants have insisted that the value of the Bulls' assets is at most somewhat over $8 million, and that the stock would have had a negative value in the millions of dollars under IBI ownership. Moreover, plaintiffs claim the basketball club is unique and that they want this team and no other. In contrast, defendants argue that the ego value of a club does not compensate for cash losses and that the very survival of the NBA would be gravely threatened if the Bulls assets and stock were transferred to plaintiffs. Finally, under IBI management, plaintiffs envision sold out audiences in the Chicago Stadium who will cheer the Bulls on to division and league championships, while defendants view the Chicago market as poor.